UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



IN RE: SET-TOP CABLE
TELEVISION BOX ANTITRUST LITIGATION

MDL No. 1995

Lead Case:
08 Civ. 7616(PKC)

## FIRST AMENDED
## CONSOLIDATED CLASS ACTION COMPLAINT

1.      Plaintiffs and class representatives, Mathew Meeds, Jason Dalen, Jenny Lell,

Jeffrey Seals, Angela Kaufman, Les Izumi, Danielle Knerr, Allan Fromen, Noam Nahary,

Matthew McAleney, William Steinke, and Robert Mitchell ("Plaintiffs"), individually and as

representatives of the putative class and subclasses described below, bring this Consolidated

Class Action Complaint against Defendant, Time Warner Cable Inc. ("Time Warner" or

"Defendant"). In support of this action, Plaintiffs state and allege as follows:

## INTRODUCTION

2.      Years ago, telephone companies insisted that it was proper and necessary that

their customers' only choice in home telephones were those leased to the customer by the

telephone company. Long after that practice was banned as abusive and anticompetitive, Time

Warner continues that profitable but illegal practice with its cable boxes.

3.      Plaintiffs bring this class action on behalf of all persons who have purchased

Premium Cable Services[1] from Time Warner and have been compelled to pay cable box rental

fees to Time Warner. Time Warner sells tiers of cable television services. At the most basic

---

[1] The term "Premium Cable Services" is defined at paragraph 44 herein, using the terminology employed in Time
Warner's explanation of its cable practices.

level of service, the cable may be connected directly to modern television sets without the need of additional equipment. However, for Premium Cable Services, for which Time Warner charges additional fees, additional equipment is required to allow the customer to receive the service. Although this practice has been determined to be anticompetitive and detrimental to consumers, Time Warner has engaged in various tactics to continue to control the cable box options available to its customers and to continue to enjoy the revenue stream created by its unlawful conduct.

4.    Time Warner does not manufacture cable boxes; it purchases them from two principal suppliers. Time Warner will not permit a customer to acquire ownership of a cable box either from Time Warner or the manufacturer. As alleged in more detail herein, Time Warner has restrained trade in cable boxes so that Time Warner is the exclusive source of cable boxes for its customers. Time Warner has used this restraint of trade to extract additional revenues from premium cable customers by charging monthly cable box rental fees in addition to the fees it charges for the Premium Cable Services.

5.    Plaintiffs had previously filed individual suits against Time Warner. The first suit filed was captioned <u>Meeds v. Time Warner Cable, Inc.</u>, filed August 12, 2008 in the United States District Court for the District of Kansas. That suit alleged that Time Warner's conduct violated both the Sherman Act and the Kansas Consumer Protection Act, and sought certification of a class of Time Warner premium cable customers within the State of Kansas. Similar lawsuits, identified below, were filed in other United States District Courts. Upon Time Warner's request, on December 12, 2008, the Judicial Panel on Multidistrict Litigation assigned these cases to this Court.

6.    Plaintiffs, collectively, bring this case as representatives of a class of Time Warner premium cable customers, described more completely below, alleging that Time Warner's past and present actions constitute an impermissible restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act"). The activities of Time Warner have and will continue to threaten to have substantial adverse competitive effects upon interstate commerce and inflict direct economic injury upon the Plaintiffs.

7.    Plaintiffs also bring this action as representatives of several subclasses for the enforcement of their rights under applicable state laws, and, as an alternative to the unitary Federal Class described above, as representatives of classes of citizens of their respective states for violations of Section 1 of the Sherman Act.

## THE PARTIES

8.    Plaintiff Mathew Meeds is a citizen of the State of Kansas, residing in Fairway, Kansas. Since approximately 1997, Plaintiff Meeds has been a subscriber of Premium Cable Services provided by Time Warner and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Meeds was the named class representative in Meeds v. Time Warner Inc., C.A. No. 2:08-2372, filed in the District of Kansas on August 12, 2008, on behalf of class members in the State of Kansas.

9.    Plaintiff Jason Dalen is a citizen of the State of Missouri, residing in Kansas City, Missouri. Plaintiff Dalen is and has been a subscriber of Premium Cable Services provided by Time Warner for a number of years and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Dalen was the named class representative in Dalen v. Time Warner Inc., C.A. No. 4:08-586, filed in the Western District of Missouri on August 14, 2008, on behalf of class members in the State of Missouri.

10.     Plaintiff Jenny Lell is a citizen of the State of California, residing in Los Angeles, California. Plaintiff Lell is and has been a subscriber of Premium Cable Services provided by Time Warner for a number of years and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Lell was the named class representative in Lell v. Time Warner Inc., C.A. No. 2:08-3925, filed in the Northern District of California on August 15, 2008, on behalf of class members in the State of California.

11.     Plaintiff Jeffrey Seals is a citizen of the State of California, residing in San Diego, California. Plaintiff Seals has been a subscriber of Premium Cable Services provided by Time Warner and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Seals was the named class representative in Seals v. Time Warner Inc., C.A. No. 3:08-1500, filed in the Southern District of California on August 15, 2008, on behalf of class members in the State of California.

12.     Plaintiff Angela Kaufman is a citizen of the State of California. Plaintiff Kaufman is and has been a subscriber of Premium Cable Services provided by Time Warner and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Kaufman was the named class representatives in Kaufman v. Time Warner Inc., C.A. No. 08-cv-05633, filed in the Central District of California on August 27, 2008, on behalf of class members in the State of California.

13.     Plaintiff Les Izumi is a citizen of the State of California, residing in San Francisco, California. At all times relevant to this action, Plaintiff Izumi resided in New York, New York and subscribed and paid for Premium Cable Services provided by Time Warner. Plaintiff Izumi was the named class representative in Izumi v. Time Warner Inc., C.A. No. 1:08-

7616, filed in the Southern District of New York on August 28, 2008, on behalf of class members in the State of New York.

14.     Plaintiff Danielle Knerr is a citizen of the State of New York, residing in Brooklyn, New York. Plaintiff Knerr is and has been a subscriber of Premium Cable Services provided by Time Warner and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Knerr was the named class representatives in <u>Knerr v. Time Warner, Inc.</u>, C.A. No. 1:09-cv-1725, filed in the Southern District of New York on February 24, 2009, on behalf of class members in the State of New York.

15.     Plaintiff Allan Fromen is a citizen of the State of New Jersey, residing in Bergen County, New Jersey. Plaintiff Fromen is and has been a subscriber of Premium Cable Services provided by Time Warner since 2003 and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Fromen was one of two named class representatives in <u>Fromen v. Time Warner Inc.</u>, C.A. No. 2:08-11349, filed in the Southern District of New York on December 30, 2008, on behalf of class members in the State of New Jersey.

16.     Plaintiff Noam Nahary is a citizen of the State of New Jersey, residing in Bergen County, New Jersey. Plaintiff Nahary is and has been a subscriber of Premium Cable Services provided by Time Warner since 1999 and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Nahary was one of two named class representatives in <u>Fromen v. Time Warner Inc.</u>, C.A. No. 2:08-11349, filed in the Southern District of New York on December 30, 2008, on behalf of class members in the State of New Jersey.

17.     Plaintiff Matthew McAleney is a citizen of the State of Maine, residing in South Portland, Maine. Plaintiff McAleney is and has been a subscriber of Premium Cable Services provided by Time Warner and has paid Time Warner a rental charge for a cable box during that

period. Plaintiff McAleney was one of two named class representatives in <u>McAleney v. Time Warner Cable, Inc.</u>, C.A. No. 1:09-cv-2261, filed in the Southern District of New York on March 11, 2009, on behalf of class members in the State of Maine.

18. Plaintiff William Steinke is a citizen of the State of North Carolina, residing in Raleigh, North Carolina. Plaintiff Steinke is and has been a subscriber of Premium Cable Services provided by Time Warner and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Steinke was one of two named class representatives in <u>McAleney v. Time Warner Cable, Inc.</u>, C.A. No. 1:09-cv-2261, filed in the Southern District of New York on March 11, 2009, on behalf of class members in the State of North Carolina.

19. Plaintiff Robert Mitchell is a citizen of the State of West Virginia, residing in Bridgeport, West Virginia. Plaintiff Mitchell is and has been a subscriber of Premium Cable Services provided by Time Warner and has paid Time Warner a rental charge for a cable box during that period. Plaintiff Mitchell was the named class representatives in <u>Mitchell v. Time Warner, Inc.</u>, C.A. No. 3:09-cv-00148, filed in the Southern District of West Virginia on February 19, 2009, on behalf of class members in the State of West Virginia.

20. Defendant Time Warner Cable Inc. ("Time Warner") is a Delaware corporation that conducts business in the State of New York, and has accepted service and appeared in this consolidated matter. Time Warner Cable Inc. became a publicly held company in 2007. Prior to becoming a publicly held company, Time Warner Cable Inc. was a subsidiary of Time Warner Inc.

21. Time Warner currently provides cable video programming services and leases cable boxes in communities, or clusters of communities, in several states. Time Warner represents that it provides cable services in the following communities:

| California: | El Centro, Los Angeles, Palm Springs, San Diego; |
|---|---|
| Carolinas: | Charlotte, Greenville-N. Bern-Washington, Myrtle Beach-Florence Raleigh-Durham Greensboro-High Point-Winston Salem, Norfolk-Portsmouth-Newport News, Savannah, Wilmington; |
| Hawaii: | (entire state) |
| Kansas: | Kansas City Metropolitan Area; |
| Maine: | Bangor, Portland-Auburn; |
| Missouri: | Kansas City Metropolitan Area; |
| Nebraska: | Lincoln; |
| New York: | Albany-Schenectady-Troy, Binghamton, Buffalo, New York City (including parts of New Jersey), Rochester, Syracuse, Utica; |
| Ohio: | Cincinnati, Cleveland, Columbus, Dayton, Lima, Northeast Ohio (incl. Akron-Canton-Youngstown-Erie), Toledo, Zanesville; |
| Texas: | Austin, Beaumont-Port Arthur, Corpus Christi, Dallas-Ft. Worth, Laredo, San Antonio, Rio Grande Valley, Waco-Killeen-Temple; |
| West Virginia: | Clarksburg-Weston; and |
| Wisconsin: | Green Bay-Appleton, Milwaukee. |

22.    Time Warner's unlawful business practices, as detailed in this complaint, are uniform within the markets in which Time Warner sells its services.

23.    The illegal and anti-competitive actions discussed below were committed by Time Warner Inc. and then, subsequent to becoming a wholly independent public company, Time Warner Cable Inc. As of Time Warner's 2007 annual report, Time Warner Inc. owns approximately 84% of the common stock of Time Warner Cable, Inc. (the Defendant, referred to as "Time Warner"). As to actions of Time Warner Inc. before splitting off Time Warner as a separate company, Time Warner is the lawful successor of the actions and liabilities of Time Warner Inc. with regard to the matters alleged herein. Based upon representations made by Time Warner's counsel, Time Warner Inc. has not yet been made a party to this litigation but Plaintiffs will request leave of the Court to join Time Warner Inc. as a party should Time Warner deny liability as to actions occurring prior to the split off.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1337, in that Plaintiffs, on behalf of themselves and the members of the Class, assert

claims under the Sherman Act, 15 U.S.C. § 1.  This Court has supplemental jurisdiction over the

state law-based claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 22 because

a significant portion of the events, acts, and omissions giving rise to this action occurred in the

District, and Defendant resides, transacts business, or is found within this District.  Moreover,

this litigation was transferred to this District by Order of the U.S. Judicial Panel on Multidistrict

Litigation dated December 12, 2008.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this class action lawsuit on behalf of themselves and the Class

pursuant to Federal Rules of Civil Procedure 23(b)(1), (2) and (3).

27.     Plaintiffs bring this class action on behalf of themselves and the following class of

persons for claims arising under federal law:

> All persons in the United States who subscribed to Time Warner
> for Premium Cable Services and paid a monthly rental fee for an
> accompanying cable box.
>
> Excluded from the Class are those Time Warner customers who
> receive service at an address at which they may receive cable
> television service from at least one competing cable or fiber optic
> video service provider in addition to Time Warner; however, this
> exclusion shall only apply as of the date such competing service
> became available and does not defeat such class members' right to
> a remedy for injuries suffered prior to the existence of such
> competition.

Excluded from the Class are Time Warner; officers, directors or employees of Time Warner; any entity in which Time Warner has a controlling interest; the affiliates, legal representatives, attorneys, heirs, or assigns of Time Warner; and any federal, state or local governmental entity, and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staffs.

28.     In addition, and subject to the exclusions from the proposed federal law class, defined above, Plaintiffs bring this class action on behalf of themselves and the following subclasses of persons for claims arising under state law and, in the alternative to the unitary federal law class, presenting claims of the Subclass for violations of the Sherman Act.  Members of each Subclass are members of the Class.

(a)  Plaintiff Meeds brings this class action on behalf of himself and the following subclass of persons:

All persons in the State of Kansas who subscribe to Time Warner for Premium Cable Services and pay a monthly rental fee for an accompanying cable box ("the Kansas Subclass").

(b)  Plaintiff Dalen brings this class action on behalf of himself and the following subclass of persons:

All persons in the State of Missouri who subscribe to Time Warner for Premium Cable Services and pay a monthly rental fee for an accompanying cable box ("the Missouri Subclass").

(c)  Plaintiffs Lell, Seals and Kaufman bring this class action on behalf of themselves and the following subclass of persons:

All persons in the State of California who subscribe to Time Warner for Premium Cable Services and pay a monthly rental fee for an accompanying cable box ("the California Subclass").

(d)  Plaintiffs Izumi and Knerr bring this class action on behalf of themselves and the following subclass of persons:

All persons in the State of New York who subscribe to Time
Warner for Premium Cable Services and pay a monthly rental fee
for an accompanying cable box ("the New York Subclass").

(e) Plaintiffs Fromen and Nahary bring this class action on behalf of themselves
and the following subclass of persons:

All persons in the State of New Jersey who subscribe to Time
Warner for Premium Cable Services and pay a monthly rental fee
for an accompanying cable box ("the New Jersey Subclass").

(f) Plaintiff McAleney brings this class action on behalf of himself and the
following subclass of persons:

All persons in the State of Maine who subscribe to Time Warner
for Premium Cable Services and pay a monthly rental fee for an
accompanying cable box ("the Maine Subclass").

(g) Plaintiff Steinke brings this class action on behalf of himself and the
following subclass of persons:

All persons in the State of North Carolina who subscribe to Time
Warner for Premium Cable Services and pay a monthly rental fee
for an accompanying cable box ("the North Carolina Subclass").

(h) Plaintiff Mitchell brings this class action on behalf of himself and the
following subclass of persons:

All persons in the State of West Virginia who subscribe to Time
Warner for Premium Cable Services and pay a monthly rental fee
for an accompanying cable box ("the West Virginia Subclass").

29. The requirements of Rule 23, including the numerosity, commonality,
predominance, typicality, adequacy and/or superiority elements are all satisfied.

30. Numerosity: The members of the proposed Class and of each Subclass are so
numerous that joinder of all members is impracticable. The proposed Class includes thousands

of members. The precise number of members of the Class can be readily ascertained through discovery, which will include Defendant's sales and other records.

31.     Commonality/Predominance: There is a well-defined community of interest and common questions of law and fact which predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from one class member to another, are based on Defendant's uniform treatment of members of the proposed Class and Subclasses, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to the following:

(a) Whether Time Warner is liable to Plaintiffs and the Class for violations of federal antitrust laws;

(b) Whether Time Warner has established illegal tying arrangements for the rental of cable boxes, in violation of federal law;

(c) Whether Time Warner's actions caused injury to Plaintiffs and the Class and whether Time Warner should be enjoined from further violations; and

(d) Whether Time Warner is liable to Plaintiffs and the Class for treble damages for its violation of federal antitrust laws;

(e) As to the Subclasses, whether Time Warner has established an illegal tying arrangement for the rental of cable boxes in violation of state law.

32.     Typicality: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all class members have been injured by the same wrongful practices in which Defendant has engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the class members and are based on the same legal theories.

33.    Adequacy:  Plaintiffs who will fully and adequately assert and protect the interests of the Class and the Subclasses, and have retained class counsel who are experienced and qualified in prosecuting class actions and, specifically, antitrust class actions.  Neither Plaintiffs nor their attorneys have any interests which are contrary to or conflicting with the Class.

34.    Superiority:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class and Subclass members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual class members prosecuting separate claims is remote, and even if every class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.  Defendant has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

35.     Following consolidation of these actions, Plaintiffs propose that the state law claims, including but not limited to those appearing in the original complaints filed in the various federal court actions listed above, be prosecuted as subclasses of the national class by the representative Plaintiff(s) who is a resident of that particular state.

36.     As to each of the subclasses identified here, the requirements of Rule 23 are satisfied for the same reasons as set forth above regarding the unitary Federal Class. The creation of subclasses will not impair the necessary finding of numerosity or materially affect any other necessary prerequisite for certification.

37.     If the Court determines that the Federal Class cannot be certified, Plaintiffs propose as an alternative that each Subclass be permitted to prosecute the Sherman Act claim on behalf of residents of the particular state represented by that Subclass.

38.     Plaintiffs do not anticipate any difficulty in the management of this litigation.

## FACTUAL ALLEGATIONS

39.     Time Warner provides cable services to customers in selected communities in several states as set forth in paragraph 21, above. Cable service providers are sometimes referred to as cable multichannel video programming distributors ("MVPDs").

40.     Time Warner's past and present conduct described herein allows it to unfairly utilize its market power and/or economic power in the cable television markets controlled by Time Warner to compel the Class to acquire necessary cable boxes solely through rental from Time Warner, thereby harming members of the Class by removing competition for the retail sale of cable boxes.

<u>The Tying and Tied Products.</u>

41.     Time Warner's cable programming is offered to consumers based upon tiers of service.  At the least expensive level of service, customers receive a limited number of local and national channels for a monthly fee.  This is known as "basic cable."  Modern television sets are sold as "cable ready" – *i.e.,* the television can receive basic cable simply by attaching the television to a cable connected to the cable MVPD system.  Television sets which are not manufactured as "cable ready" units also require the use of a cable box.  However, due to the availability of "cable ready" televisions in the market, customers who rent a cable box but receive only basic level service are not included in the Class.

42.     Customers desiring more choice in video programming can, for an additional monthly fee, subscribe to Time Warner's Premium Cable Services and pay an increased monthly fee to Time Warner.  Members of the Class are Time Warner customers who elect to receive premium channels such as HBO, Showtime, and other specialty channels and video programming services not included in the basic cable programming.

43.     Time Warner's 2008 Annual Report, filed with the Securities Exchange Commission ("SEC"), refers to these additional offerings as "specialized tiers and premium services".  As explained in Time Warner's marketing materials (published at http://www.timewarnercable.com/kansascity/site.faqs/Equipmenta as of April 07, 2009:

> "**Cable Converter Boxes**
>
> Cable converter boxes serve two key purposes:
> - Allows TV sets that are not cable-ready to recognize cable input and expand channel capacity
> - Allows cable subscribers to view premium/optional channels
>
> To view channels offered in any of our cable services, your TV needs to be "cable-ready" or have a cable box.  A TV is cable-ready when it has the capacity to reach a larger

14

number of channels and recognizes cable input. Your TV set is always tuned to channel 3 whenever a cable box is used.

**Viewing Subscription Channels**

Some channels on cable are optional "subscription" channels that are not part of your basic or standard services. These subscription channels include HBO, Cinemax, Showtime, TMC, etc. A cable box is required to view subscription channels, even though you have a cable-ready TV. These channels are available for a small monthly fee. If you are a subscriber, the cable box "unscrambles" these channels so you can view them.

44.     For purposes of this Complaint, "Premium Cable Services" is defined as those cable video services, which are not available to customers by simply plugging a cable into a cable-ready television, referred to by Time Warner as "premium/optional channels" or "optional subscription channels." This would include all scrambled or otherwise secured video channels, as well as "pay per view" or "on demand" cable video programming, for which Time Warner charges fees other than the fee for basic cable.

45.     According to the most recent Federal Communications Commission ("FCC") annual report on competition in the industry, as of 2005, there were approximately 96.9 million subscriptions for Premium Cable Services sold by cable MVPDs (including, but not limited to, Time Warner) in the United States. Time Warner does not disclose the precise number of premium cable service subscribers; however, such information is readily available in discovery.

46.     The Premium Cable Services offered by Time Warner are the "tying product."

47.     In addition to paying a fee for cable television, customers that pay for Premium Cable Services must also pay a rental fee to Time Warner for a cable box, sometimes referred to as a "set-top box." The cable box in its simple form serves two functions. First, the cable box allows the consumer to receive video signals and to navigate among the channels carried on a particular cable system. The second function is a cable descrambler or "conditional access

15

device" which controls the security features for premium channels to ensure that customers do not receive Premium Cable Services for which they have not paid.

48.     The "tied product" is the cable box which Time Warner rents to consumers, for an additional monthly fee, to enable them to utilize Time Warner's Premium Cable Services. For purposes of this pleading, the term "cable box" also includes the dedicated remote control for such cable box, whether or not Time Warner also charges a separate fee for the rental of the remote control. For purposes of this pleading, the term "cable box" also includes cable boxes which include features in addition to those required to perform the basic navigation and security functions, including, but not limited to cable boxes which have an additional functionality as a Direct Video Recorder ("DVR").

49.     The tying product and the tied product are separate and distinct products. Time Warner does not design or manufacture the cable box. Time Warner merely purchases the mass produced cable boxes from the manufacturer and compels its Premium Cable Services customers to rent the cable boxes from Time Warner.

50.     Although cable boxes are manufactured, or would be capable of manufacture, by numerous entities, upon information and belief, the market has been historically dominated by just two suppliers, Scientific Atlanta (a subsidiary of Cisco Systems, Inc.) and Motorola, Inc., both of which work under contract with Time Warner and supply cable boxes to Time Warner. In 2008, Time Warner also began acquiring cable boxes from Samsung as an additional supplier. Upon information and belief, neither Scientific Atlanta, nor Motorola nor Samsung will sell these cable boxes to the general public.

Coercion to Purchase the Tied Product.

51.     Time Warner requires class members to rent a cable box directly from Time Warner and from no other source besides Time Warner. Thus, Time Warner ties its Premium Cable Services to the cable box that it requires class members to rent.

52.     Prior to July 1, 2007, the only cable boxes recognized as permissible by Time Warner were those rented to consumers by Time Warner. Time Warner would not provide the Premium Cable Services unless the customer also rented a cable box from Time Warner. However, as explained below, even after July 1, 2007, Time Warner continues to require consumers to acquire cable boxes only through Time Warner and denies consumers the benefits of a competitive market in these devices.

53.     Time Warner's practice of requiring consumers to rent a cable box from Time Warner to the exclusion of any other source was recognized as an anticompetitive practice. Congress enacted 47 U.S.C. § 549, Section 629 of the Communications Act of 1934, directing the FCC to adopt regulations:

> "to assure the commercial availability, to consumers of multichannel video programming and other services offered over multichannel video programming systems [i.e. cable companies] of converter boxes, interactive communications equipment and other equipment used by consumers to access multichannel video programming and other services offered over multichannel video programming systems, from manufacturers, retailers and other vendors not affiliated with any multichannel video programming distributor."

54.     Pursuant to 47 U.S.C. § 549, in 1998, the FCC, in an effort to stop the anticompetitive practices described herein, directed the cable industry to make the security

elements of a cable box available separately from the channel navigation aspects of a cable box (sometimes also called "host devices"), so that a free and open market for such cable boxes could be developed by consumer electronic retailers. The cable industry was given until January 1, 2005 to make available a separate security element (referred to as a "point of deployment module" or "POD") which would provide the security element of the cable box separately from the navigation device.

55.     The cable and consumer electronics industries use the common name "CableCARD" to refer to the POD security devices compelled by the FCC.

56.     Time Warner opposed the CableCARD regulation, and Time Warner and other MVPDs were successful in delaying the effective date of the regulation from January 1, 2005, until July 1, 2007.

57.     Time Warner's control of the delivery of Premium Cable Services in the markets in which it does business enables Time Warner to control the security mechanisms and navigation technology used in its systems.

58.     Time Warner has used its control over the geographic markets in which it does business to inhibit and thwart the effectiveness of CableCARD technology and to preserve its ability to coerce to its customers into continuing to acquire cable boxes solely by rental from Time Warner in a non-competitive market.

59.     Manufacturers of consumer electronic products who desire to enter into the market for cable boxes, have repeatedly complained that Time Warner and other cable companies have engaged in practices to prevent the CableCARD from becoming an effective option for consumers who no longer wish to pay rental fees for cable boxes. For example, in December, 2006, the Consumer Electronics Association ("CEA") sent a lengthy objection to the

FCC concerning the practices of cable MVPDs (including Time Warner) which were thwarting the implementation of CableCARD and preventing consumer electronics manufactures from competing in the cable box market. The existence of the CableCARD has not produced the intended result of introducing competition into the market for cable boxes.

60.     Despite the FCC rules and related pronouncements, Time Warner has taken various steps to prevent consumers from enjoying the benefits of the CableCARD technology. For instance, diagrams of cable "hookup," available on Time Warner's website, focus on the existence of a cable box, with no mention of possible use of the CableCARD. Elsewhere on its website, Time Warner represents to its customers that "there are limitations to a CableCARD connection." Further, Time Warner promotes the use of Time Warner's cable boxes, rather than the CableCARD technology, by stating: "Customers who want the easy-to-use on-screen guide and interactive features of digital cable service will want to connect via a Time Warner Cable digital set-top box." Time Warner also represents that the ability to view basic and digital cable channels, as well as premium cable channels, "varies" with use of a CableCARD but not with its cable box. Additionally, Time Warner represents that: "Digital Cable and Digital Receiver are required to access Premium Services. **To receive all services, Digital Cable, remote and lease of a Digital set-top box are required.**" (emphasis added).

61.     Since the CableCARD mandate became effective, anecdotal evidence of Time Warner's response to consumer requests for information on alternatives to the cable boxes shows a consistent effort to continue to coerce the use of only Time Warner's cable box. For example, in August 2008, Plaintiff Seals was told by Time Warner that he must rent the cable box from Time Warner, and that he could not purchase a cable box either from Time Warner or from any other source.

62.    In 2008, the FCC cited Time Warner for repeated violations of the CableCARD regulations for taking actions designed to discourage and prevent the use of cable boxes not leased from Time Warner or to compel the users of non-Time Warner equipment to nonetheless rent a cable box from Time Warner.

63.    Despite the FCC mandated creation of CableCARD technology, Time Warner continues to limit the employment of that technology and continues to require consumers of its Premium Cable Services to continue to rent their cable boxes from Time Warner as a requirement of receiving the Premium Cable Services for which they pay. As a result of Time Warner's actions, CableCARD technology has not been widely adopted or marketed by consumer electronic manufacturers.

64.    As further evidence of Time Warner's intent and ability to prevent the CableCARD technology from diminishing its control over the cable box market, Time Warner has preserved its position as the sole supplier of cable boxes to its customers by implementing technology which renders the CableCARD technology useless, or impairs its utility, unless the customer also is renting a cable box from Time Warner.

65.    Before any widespread implementation of the CableCARD system, Time Warner was already making changes to its distribution system to make the CableCARD technology obsolete or redundant by a variety of means, including introducing new technologies which did not employ the CableCARD device or standards. These technologies include OCAP or "tru2way," by which the cable box is able to communicate information back to Time Warner and Time Warner may control the content available on a cable route in response to requests from the customer. To further consolidate its position, Time Warner has now switched desirable programs and services to distribution methods, including tru2way technology, which renders

such programs and services inaccessible to customers using a CableCARD device without also renting a cable box from Time Warner.

66.     Although Time Warner, and its selected suppliers, now employs versions of the OCAP or "tru2way" technology in the cable boxes Time Warner rents to consumers, OCAP and "tru2way" are not available on the open market and there continues to be no commercially available alternative to consumers to renting the cable box from Time Warner.

67.     Despite the requirements of federal law, and Time Warner's representation that it is in compliance with the law, Time Warner continues to require consumers to acquire their cable box only by renting from Time Warner.

Economic Power in the Tying Product Market.

68.     Time Warner is the second largest cable MVPD in the United States.

69.     Cable MVPDs, including Time Warner, do not normally compete against each other, but operate in geographically divided local markets. Generally, Plaintiffs – and all other current and potential cable television subscribers in a Time Warner market – have no choice but to contract with Time Warner for cable service. Accordingly, Time Warner has *de facto* monopoly power in many areas in which it provides cable television services or otherwise has sufficient market power to appreciably restrain free competition as alleged herein. Indicative of such monopoly power, over the last decade, average cable prices paid by consumers have risen by 93%, or three times the inflation rate over the same period.

70.     In those markets controlled by Time Warner, Time Warner's control over all cable television services naturally gives Time Warner control over Premium Cable Services. Although the tiers of service are vertically differentiated, Premium Cable Services rely upon the same basic infrastructure, with the addition of the cable box in the customer's home.

71.     According to the Thirteenth Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, issued by the FCC on January 19, 2009 (the "FCC Assessment"), although video programming is distributed by means other than cable, most notably broadcast and satellite services, cable MVPD is the dominant force in the market, and enjoys a nationwide market share of almost 70%. A Congressional research report in 2007 found that cable controlled 69% of the nationwide MVPD market, compared to 27.7% for direct satellite transmission. Moreover, any nationwide statistic on cable vs. satellite MVPD competition under-represents Time Warner's competitive position in the markets in which it chooses to do business, in that satellite MVPD services are available in areas in which no cable television service is available. Conversely, in urban areas, the physical requirements required to receive satellite MVPD services (an external surface with a clear sight line to the sky on which to attach a satellite dish) are harder to find, and often specifically foreclosed to tenants and apartment owners by landlords and/or condominium or cooperative rules. The difficulty in meeting the physical requirements for receiving satellite MVPD services further limits the competitive pressure of satellite services upon cable services. Thus, a 2005 general accounting office ("GAO") study found that satellite MVPD market penetration was only 13% in urban areas, compared to 29% in rural areas.

72.     In addition to Time Warner's claimed superiority in service and reliability over satellite MVPD services, Time Warner enjoys a competitive advantage over such services by its ability to "bundle" its MVPD services with broadband internet access and phone service, provided over the same cable facilities. Because broadband internet access and phone service are not available through satellite MVPD technology, Time Warner enjoys a competitive advantage over satellite MVPDs in those areas in which Time Warner does business. According

22

to Time Warner's most recent SEC Form 10-K, the number of its customers who elect to receive video, data and phone services through Time Warner's cable lines has risen 31% between 2007 and 2008.

73.     Moreover, in those markets in which Time Warner does business, it has a further advantage as the incumbent service provider in that switching from Time Warner cable to another MVPD provider, whether an overbuilder, an incumbent phone company or a satellite MVPD, carries inherent costs to the consumer, including equipment acquisition and time, which must be weighed against whatever benefit the consumer perceives will be attained as a result of the change.  Thus, studies have found that even though satellite MVPD customers indicate a high degree of satisfaction with their service, and cable MVPD customers indicate a low degree (less than 50%) of satisfaction with their service, their remains little movement between the two.

74.     As a result, satellite MVPD service is not a suitable direct substitute for cable MVPD services.  It has not been demonstrated that customers are willing to transfer service from a cable MVPD to a satellite MVPD, despite monopoly pricing for existing customers of the cable MVPD.  The FCC Assessment cites evidence that competition from non-cable video programming does not have an effect of restraining prices charged by cable MVPDs.  However, in the few locations where consumers have a choice between two cable services, the FCC reports that prices for cable service are 20% lower than in locations with only one cable MVPD.

75.     There are also very high barriers to entrance for any potential cable competitor in an established cable MVPD market.  The FCC Assessment notes that, along with the high capital cost of constructing a parallel cable system, there are obstacles to competition created by local franchising authorities, obtaining access to multiple dwelling unit customers (for example – tenants in apartments buildings) and obstacles created by exclusive programming rights to

popular channels. As a result of these obstacles, there has been very little effort to construct cable systems to compete with existing cable systems and such systems are believed to serve less than 2% of the MVPD market.

76.     Where a competing cable system – referred to in the industry as an overbuild – has been created, the overbuild systems are not geographically coextensive with incumbent cable system. As Time Warner noted in its 2008 Annual Report (Form 10-K, filed with the SEC on February 20, 2009), such overbuilt systems are usually created by relatively small companies. Time Warner has been able to respond to such overbuilt systems by lowering prices, not in the entire market, but only in those areas in which the overbuild system actually competes with Time Warner. More detailed information concerning the geographic scope of such overbuild cable systems is in the possession of Time Warner and available in the course of discovery.

77.     If anything, the cable MVPD market has been marked by concentration as regional cable MVPDs have been absorbed by the market leaders. This trend toward concentration in lucrative markets includes the dissolution of the cable MVPD Adelphia and the acquisition of its markets by Time Warner and Comcast in 2006. As noted by several GAO and FCC reports, when a single cable MVPD controls several contiguous market areas, that cable MVPD enjoys a greater freedom from competition, a greater ability to raise prices, and a greater deterrent to overbuilding by a competing cable MVPD.

78.     The only apparently viable threat to Time Warner's market power has been the very recent arrival of competing MVPD services through fiber optic phone facilities offered chiefly through Verizon and AT&T. These services have not previously been commercially available to consumers on a widespread basis and are viewed as an arising threat, rather than a

current competitive influence upon cable MVPDs. Again, as with satellite MVPDs, customers incur substantial switching costs in changing service.

79.     According to the FCC Assessment and Time Warner's financial reports, the demand for, and price of, Premium Cable Services has consistently risen, resulting in higher revenues for Time Warner and other cable MVPDs offering premium services.

80.     In its 2008 Annual Report, Time Warner warned its investors that increased competition for overbuilders and from "consumer electronics providers" would change Time Warner's future business models and financial results and that increased competition "could require TWC [Time Warner] to charge lower prices for existing or future services...."

Anticompetitive Effects in the Tied Market.

81.     As noted above, for most of the relevant time period, the United States market for cable boxes has been dominated by just two companies, Scientific Atlanta and Motorola. In 2008, Time Warner also began also acquiring cable boxes from Samsung as an additional supplier.

82.     Time Warner is simply purchasing cable boxes at a fixed cost from the manufacturers only to turn around and rent the very same boxes to the Class, with full knowledge that the Class, as a result of Time Warner's improper conduct, has no choice but to pay the rental fees charged by Time Warner.

83.     Time Warner not only refuses to permit customers to use other brands of cable boxes, Time Warner refuses to sell its customers the cable boxes it rents to them and does not permit such products to be purchased directly from the manufacturer for use with a Time Warner system.

84.     Upon information and belief, Time Warner's suppliers of cable boxes are able to dominate the market as a result of the anticompetitive conduct of Time Warner and other cable MVPDs.  Because Time Warner and other cable MVPDs refuse to permit customers to acquire cable boxes other than by rental through the cable company, consumers suffer, and the suppliers to Time Warner and other cable MVPDs benefit from the removal of competitors and competition in the market for cable boxes.  At the same time, Time Warner benefits from the absence of a competitive consumer market for cable boxes because the absence of competition allows Time Warner to compel consumers to rent the cable box from Time Warner, thereby producing a monthly revenue stream from the Class to Time Warner arising directly from its anticompetitive conduct.

85.     Upon information and belief, based upon allegations made in other litigation, Scientific Atlanta and Motorola have previously demonstrated very close relationships with cable MVPDs, including at least one documented case of a willingness to act in collusion with cable MVPDs to manipulate sales data and contracts relating to the sales of cable boxes.

86.     The contracts between Time Warner and the suppliers of cable boxes are not public information but are in the possession of Time Warner and may be obtained in discovery. It is not presently known whether such contracts contain an explicit agreement by the manufacturers to refuse to deal with the general public in selling cable boxes.

87.     If not for the tying of products, Plaintiffs and the Class could purchase a cable box from a manufacturer of their choice and use it to access the Premium Cable Services provided (for a cost) by Time Warner.  As noted above, the CEA (previously defined) has expressed not only a willingness to enter into the cable box market, but has protested to the FCC that Time

Warner and other major cable MVPDs have engaged in apparently coordinated efforts to keep them out of that market.

88.     Time Warner's 2008 Annual Report, claims that several major consumer electronics brands, including LG Corporation (Zenith and Gold Star brands), Sony Corporation, Panasonic Corporation and Samsung Electronics Co. have entered into license agreements for the tru2way technology to be incorporated into a new generation of tru2way cable ready televisions. In that filing, Time Warner states that it believes such devices/technology will become available to consumers in mid-2009. However, as of mid-April 2009, such products appear to be only in the planning and demonstration phases and are not available to consumers of Time Warner's Premium Cable Services. As pointed out by the CEA's December 2006, letter to the FCC, although Time Warner and other cable MVPDs reported to the FCC that they were committed to the true2way technology, these same companies had previously represented that they were committed to CableCARD. Quite obviously, consumer electronic manufacturers have not been willing to commit their resources to new product lines when the cable MVPDs have demonstrated a desire to preserve their market positions by changing the technological standard. The choice to use alternative technologies in lieu of a Time Warner cable box, has not been available, and is not currently available to the Class.

89.     The choice to use other cable boxes is not available to the Class as a result of Time Warner's practices. By compelling customers to rent cable boxes, and in restraining an open market for cable boxes, Time Warner coerces Plaintiffs and the Class to pay a significantly larger sum of money than would be required if the two distinct products (Premium Cable Services and cable box) were not tied by Time Warner.

90.     Although not verified, and not admitted as true by Plaintiffs, Time Warner estimates that the useful life of a cable box is between 3 and 5 years.  In many cases, the rental fees that the Class is forced to pay for the cable boxes supplied by Time Warner exceed the true cost of the cable box, even if the cost of the cable box were unadjusted for the effect of the anticompetitive practices on the price of cable boxes.

The Effect on Interstate Commerce is Not Insubstantial.

91.     As of June 20, 2008, Time Warner had approximately 14.7 million cable subscribers.  Upon information and belief, Time Warner provides cable services to more than 1 million customers in the New York metropolitan market alone.

92.     According to Time Warner's figures, more than 8 million of its subscribers have upgraded from basic cable to digital video services, referred to herein as the Premium Cable Services, and therefore rent cable boxes from Time Warner.

93.     Time Warner's 2008 Annual Report lists a capital investment in "customer premises equipment," a category which includes digital set-top boxes, remote controls, high-speed data modems, telephone modems and the costs of installing such new equipment, at more than $1.6 billion.  Time Warner's 2008 Annual Report lists revenues from "equipment rental and installation charges" of more than one billion dollars in 2008, a 9% increase from 2007.  The exact proportion of this revenue stream attributable to the rental of cable boxes is not disclosed; upon information and belief, such information is in the possession of Time Warner and available in the course of discovery.

94.     Time Warner's 2008 Annual Report to investors also warns of the potential risk to Time Warner's revenues should a viable competitive market for cable boxes develop through the availability and consumer acceptance of cable boxes from sources other than Time Warner.

95.     The exact amount of revenue which Time Warner derives from the lease of cable boxes is not known but should be readily discernable in discovery.  It is clear, however, that the amount of money at issue is "not insubstantial."

## COUNT I
### (Violation of the Sherman Anti-Trust Act - Unlawful Tying)

96.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

97.     Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, makes it unlawful to enter into a contract in restraint of trade or commerce.  Congress has granted a private right of action to those injured in violation of this provision.

98.     Plaintiffs, on behalf of themselves and the Class, seek redress for Time Warner's violation of Section 1 of the Sherman Anti-Trust Act.

99.     Time Warner improperly ties and bundles its Premium Cable Services with the required rental of a cable box.  Specifically and as explained above, Time Warner contracted with the Class to provide Premium Cable Services but only on the condition that the Class also lease a cable box from Time Warner.

100.    As a result, the Class cannot unbundle the tied products (the Premium Cable Services and the cable box).

101.    There is a market for cable boxes that is separate and apart from the market for Time Warner cable services.  The two items (Premium Cable Services and the cable box) are distinct and separate products.

102.    Because of Time Warner's market power in those communities in which it is the sole cable MVPD, the Class is forced to pay rental fees for the cable box in addition to fees for

Premium Cable Services and is deprived the option of purchasing the cable box, in a free and open market or even directly from Time Warner or its suppliers.

103.     Defendant has, at all times relevant to this action, maintained sufficient economic power in the Premium Cable Services market to coerce Plaintiffs and the Class to lease and/or otherwise accept the tied product (the cable box) that they would not otherwise lease or accept from Time Warner. This economic power will continue absent the relief sought herein.

104.     Time Warner's improper tying and bundling harms competition. Upon information and belief, just two manufacturers of cable boxes dominate the industry and they provide most of their products to Time Warner and a small group of other major cable MVPDs. Since the Class can only lease cable boxes directly from Time Warner, there is little incentive for other manufacturers to enter the market, and those that do are foreclosed from renting and/or selling cable boxes directly to members of the Class at a lower, market-driven, cost.

105.     Defendant's conduct at issue involves a substantial amount of interstate commerce in the market for cable boxes.

106.     Time Warner's tying and bundling of its Premium Cable Services and cable boxes constitutes an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1.

107.     There is no lawful business justification for Time Warner's actions.

## COUNT II
## The Kansas Subclass
## (Violation of Kansas Consumer Protection Act)

108.     Plaintiff Meeds incorporates by reference the preceding paragraphs as if fully set forth herein.

109. At all relevant times there was in effect the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq*. (the "KCPA").

110. Time Warner constitutes a "supplier," as defined by K.S.A. § 50-624(j) of the Act, and as referenced in K.S.A. § 50-626 of the KCPA.

111. Time Warner has sold and/or advertised "property" in "consumer transactions" in the State of Kansas, as those terms are defined by K.S.A. § 50-624 of the KCPA.

112. Plaintiff Meeds and all members of the Kansas Subclass are "consumers" as that term is defined by K.S.A. § 50-624(b).

113. Plaintiff Meeds, the Kansas Subclass, and Time Warner participated in a "consumer transaction" as that phrase is defined by K.S.A. § 50-624(c).

114. Time Warner's actions as alleged herein violate the Act, particularly K.S.A. §§ 50-626 and 50-627.

115. Section 50-626 of the KCPA provides, in pertinent part:

(a) No supplier shall engage in any deceptive act or practice in connection with a consumer transaction.

(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:

 . . . .

(3) the willful failure to state a material fact, of the willful concealment, suppression or omission of a material fact . . . .

116. Section 50-627 of the KCPA further provides, in pertinent part:

(a) No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction.

(b) The unconscionability of an act or practice is a question for the court. In determining whether an act or practice is unconscionable, the court shall consider

circumstances of which the supplier knew or had reason to know, such as, but not limited to the following that:

> (1) The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

> (2) when the consumer transaction was entered into, the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers;

> . . . .

> (5) the transaction the supplier induced the consumer to enter into was excessively one-sided in favor of the supplier;

117.    Time Warner's actions as alleged herein violate these provisions (K.S.A. §§ 50-626 and 50-627) of the KCPA.

118.    As a result of Time Warner's action, Plaintiff Meeds and members of the Kansas Subclass have been injured and damaged in an amount to be established at trial and are entitled to the remedies set forth in the KCPA, particularly those remedies found at K.S.A. § 50-634, including, without limitation, injunctive relief, damages, and attorneys' fees.

119.    If the Court determines that the Federal Class cannot be certified, Plaintiff Meeds and the members of the Kansas Subclass incorporate by reference the allegations of Count I of this Complaint as if fully set forth herein, on behalf of all members of the Kansas Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

### COUNT III
### The Missouri Subclass
### (Violation of the Missouri Merchandising Practices Act)

120.    Plaintiff Dalen incorporates by reference the preceding paragraphs as if fully set forth herein.

121.    At all relevant times there was in effect the Missouri Merchandising Practices Act, § 407.010, *et seq.* (the "MMPA").

122.    Section 407.020.1 of the Act provides, in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice.

123.    Time Warner constitutes a "person," as defined by § 407.010(5) and as referenced in § 407.025.1 of the MMPA.

124.    Time Warner has sold and/or advertised "merchandise" in "trade" or "commerce" in the State of Missouri, as those terms are defined by § 407.010 of the MMPA and as referenced in § 407.025.1 of the MMPA.

125.    Section 407.025.2 of the Act specifically allows for class actions and class-wide relief for violations of the MMPA.

126.    Time Warner's deceptive actions and unfair practices, discussed and presented in detail above, are unlawful and in violation of the Act.

127.    Plaintiff Dalen, and all members of the Missouri Subclass, are entitled and empowered under § 407.025.1 of the Act to bring this act to recover the damages they have suffered as a result of Time Warner's deceptive actions and unfair practices which, again, are set forth and explained in detail above.

128.    In addition to damages, Plaintiff Dalen and the Missouri Subclass seek and are entitled to punitive damages, attorneys' fees and other equitable relief as allowed by § 407.025.1 of the MMPA.

129. If the Court determines that the Federal Class cannot be certified, Plaintiff Dalen and the members of the Missouri Subclass incorporate by reference the allegations of Count I of this Complaint as if fully set forth herein, on behalf of all members of the Missouri Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

## COUNT IV
### The California Subclass
### (Violation of Business and Professions Code §17200 *Et Seq.*)

130. Plaintiffs Lell, Seals and Kaufman incorporate by reference the preceding paragraphs as if fully set forth herein.

131. This cause of action is brought on behalf of Plaintiffs Lell, Seals and Kaufman and the California Subclass pursuant to California Business and Professions Code §17200, *et seq.*

132. Business & Professions Code section 17200 *et seq.* provides that unfair competition means and includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading marketing."

133. By and through their conduct, including the conduct detailed above, Defendant engaged in activities which constitute unlawful, unfair, and fraudulent business practices prohibited by Business & Professions Code section 17200 *et seq.* Beginning at an exact date unknown as yet and continuing up through the present Defendant committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Business & Professions Code section 17200 *et seq.*, by engaging in the unlawful tying arrangements detailed herein that are violative of the Sherman Act and regulations of the FCC.

134.     Beginning at an exact date unknown as yet and continuing up through the present, Defendant committed acts of unfair competition that are prohibited by Business and Professions Code section 17200 *et seq*. Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes, by engaging in practices that threatens an incipient violation of law, or violates the policy or spirit of laws because the effect are comparable to or the same as a violation of the law by engaging in the unlawful tying arrangements detailed herein.

135.     Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes, by engaging in practices that are immoral, unethical, oppressive or unscrupulous, the utility (if any) of which conduct is far outweighed by the harm done to consumers and public policy by engaging in the unlawful tying arrangements detailed herein.

136.     Alternatively, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the statutes, by engaging in practices wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was of the kind that the consumers themselves could not reasonably have avoid by engaging in the unlawful tying arrangements detailed herein.

137.     Beginning at an exact date unknown as yet and continuing up through the present, Defendant committed acts of unfair competition, including those described above, prohibited by Business and Professions Code section 17200 *et seq.* by engaging in a pattern of "fraudulent" business practices within the meaning of Business & Professions Code section 17200 *et seq.*, by engaging in the unlawful tying arrangements detailed herein.

138.    Defendant engaged in these unlawful, unfair and fraudulent business practices for the primary purpose of collecting unlawful and unauthorized monies from Plaintiffs and all others similarly situated, thereby unjustly enriching Defendant.

139.    As a result of the repeated violations described herein, Defendant received and continues to receive unearned commercial benefits at the expense of their competitors and the public.

140.    Defendant's unlawful, unfair and fraudulent business practices presents a continuing threat to the public in that Defendant continues to engage in unlawful conduct.

141.    Such acts and omissions are unlawful and/or unfair and/or fraudulent and constitute a violation of Business & Professions Code section 17200 *et seq*.  Plaintiffs reserve the right to identify additional violations by Defendant as may be established through discovery.

142.    As a direct and legal result of their unlawful, unfair and fraudulent conduct described herein, Defendant has been and will be unjustly enriched by the receipt of ill-gotten gains from customers, including Plaintiffs, who provided money to Defendant based on Defendant's unlawful tying arrangement.

143.    Plaintiff and members of the California Subclass suffered an "actual injury" because their money was taken by Defendant as a result of Defendant's unlawful tying arrangements.

144.    In prosecuting the California Subclass, which is an action for the enforcement of important rights affecting the public interest, Plaintiffs seek the recovery of reasonable attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5, which is available to a prevailing plaintiff who wins relief for the general public.

145. Plaintiffs Lell, Seals and Kaufman and the California Subclass are further entitled to pre-judgment interest as a direct and proximate result of Time Warner's wrongful conduct. The amount of damages suffered by Plaintiffs as a result of said acts was a sum certain and capable of calculation and Plaintiffs are entitled to interest in an amount to be set forth according to proof.

146. If the Court determines that the Federal Class cannot be certified, Plaintiffs Lell, Seals and Kaufman and the members of the California Subclass incorporate by reference the allegations of Count I of this Complaint as if fully set forth herein, on behalf of all members of the California Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

## COUNT V
### The New York Subclass
### (Violation Of New York's Donnelly Act)

147. Plaintiffs Izumi and Knerr incorporate by reference the preceding paragraphs as if fully set forth herein.

148. By their conduct described herein, Defendant has illegally tied two distinct and unique products (Premium Cable Services and cable boxes), which conduct proximately caused Plaintiffs Izumi and Knerr and the New York Subclass to sustain damages and which conduct restrained trade.

149. Defendant's conduct has damaged Plaintiffs Izumi and Knerr and the New York Subclass members in that they have paid significantly more for their cable boxes than they would have absent Defendant's illegal conduct.

150. If the Court determines that the Federal Class cannot be certified, Plaintiffs Izumi and Knerr and the members of the New York Subclass incorporate by reference the allegations

37

of Count I of this Complaint as if fully set forth herein, on behalf of all members of the New York Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

## COUNT VI
### The New Jersey Subclass
### (Violation of N.J. Stat. Ann. § 56:8-1 *et seq.*)

151.     Plaintiffs Fromen and Nahary incorporate by reference the preceding paragraphs as if fully set forth herein.

152.     This cause of action is brought on behalf of Plaintiffs Fromen and Nahary and the New Jersey Subclass pursuant to New Jersey Statute § 56:8-1 *et seq.*

153.     Plaintiffs Fromen and Nahary and the New Jersey Subclass are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1 because they are individual consumers.

154.     Time Warner is a "person" within the meaning of N.J. Stat. Ann. § 56:8-1 because it is a domestic corporation doing business within the state of New Jersey.

155.     Time Warner's rental of cable boxes to Plaintiffs Fromen and Nahary and the New Jersey Subclass constitutes the "sale . . . of any merchandise" within the meaning of N.J. Stat. Ann. § 56:8-2.

156.     Plaintiffs Fromen and Nahary and the New Jersey Subclass allege that Time Warner committed unconscionable commercial practices and/or deceptive practices as explained, discussed and set forth in detail above, within the meaning of N.J. Stat. Ann. § 56:8-2 in connection with its rental of cable boxes to Plaintiffs Fromen and Nahary and the New Jersey Subclass.

157.     Time Warner's actions, as detailed above, constitute an unconscionable commercial practice to the extent Time Warner illegally leveraged its monopoly power in the

Premium Cable Services market to force Plaintiffs Fromen and Nahary and the New Jersey Subclass to rent cable boxes from Time Warner at artificially inflated prices.

158.    Time Warner's actions, as detailed above, constitute a deceptive or misleading practice to the extent Time Warner misrepresented to Plaintiffs Fromen and Nahary and the New Jersey Subclass that Premium Cable Services could only be delivered through Time Warner-provided cable boxes when other less expensive means of delivery were available but for Time Warner's refusal to make such available to Plaintiffs Fromen and Nahary and the New Jersey Subclass. Such actions are also deceptive or misleading to the extent Time Warner failed to inform Plaintiffs Fromen and Nahary and the New Jersey Subclass that such less expensive means of delivery existed.

159.    Time Warner made such omissions with the intent that Plaintiffs Fromen and Nahary and the New Jersey Subclass rely on them to their detriment.

160.    Because Time Warner knew that other less expensive means of delivery of Premium Cable Services existed other than through the rental of Time Warner-provided cable boxes, and because Time Warner extracted excess profits from Plaintiffs Fromen and Nahary and the New Jersey Subclass from the rental of such cable boxes, Time Warner committed all acts alleged in this Count knowingly.

161.    Time Warner's actions, as detailed above, proximately caused ascertainable economic loss to Plaintiffs Fromen and Nahary and the New Jersey Subclass to the extent they were forced by Time Warner to overpay for access to and delivery of Premium Cable Services from Time Warner through Time Warner's rental of cable boxes to them. The precise amount of such overpayment will be proven at trial.

162.     Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs Fromen and Nahary and the New Jersey Subclass seek treble their actual damages caused by Time Warner's violations of N.J. Stat. Ann. § 56:8-2 alleged herein, reasonable attorney's fees, filing fees, costs and all other remedies available to them under the law as the Court deems just and proper.

163.     If the Court determines that the Federal Class cannot be certified, Plaintiffs Fromen and Nahary and the members of the New Jersey Subclass incorporate by reference the allegations of Count I of this Complaint as if fully set forth herein, on behalf of all members of the New Jersey Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

## COUNT VII
### The Maine Subclass
### (Violation Of The Maine Antitrust Act – Unlawful Tying)

164.     Plaintiff McAleney incorporates by reference the preceding paragraphs as if fully set forth herein.

165.     The Maine Antitrust Act makes it unlawful to enter into a contract in restraint of trade or commerce.  10 M.S.R.A. § 1101. The Legislature has granted a private right of action to individuals harmed by violations of this Act.  10 M.S.R.A. § 1104.

166.     As set forth herein, Time Warner has violated 10 M.S.R.A. § 1101, in conditioning the sale of Premium Cable Service upon the lease of a cable box from Time Warner.

167.     At all times relevant hereto, Time Warner has maintained, and exerted sufficient economic and market power to coerce Plaintiff and the Maine Subclass to pay rent for the cable box and accept the tied products.

168.     Plaintiff, on his own behalf and on behalf of the Maine Subclass, seeks to recover damages they suffered as a result of Time Warner's violation of the Maine Antitrust Act as set forth above.

169.     If the Court determines that the Federal Class cannot be certified, Plaintiff McAleney and the members of the Maine Subclass incorporate by reference the allegations of Count I of this Complaint as if fully set forth herein, on behalf of all members of the Maine Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

## COUNT VIII
### The North Carolina Subclass
### (Violation Of The North Carolina Antitrust Act – Unlawful Tying)

170.     Plaintiff Steinke incorporates by reference the preceding paragraphs as if fully set forth herein.

171.     The North Carolina Antitrust Act makes it unlawful to enter into a contract in restraint of trade or commerce. N.C.G.S.A. § 75-1. The Legislature has granted a private right of action to individuals harmed by violations of this Act. N.C.G.S.A. § 75-16.

172.     As set forth herein, Time Warner has violated N.C.G.S.A. § 75-1, in conditioning the sale of Premium Cable Service upon the lease of a cable box from Time Warner.

173.     At all times relevant hereto, Time Warner has maintained, and exerted sufficient economic and market power to coerce Plaintiff and the North Carolina Subclass to pay rent for the cable box and accept the tied products.

174.     Plaintiff, on his own behalf and on behalf of the North Carolina Subclass, seeks to recover damages they suffered as a result of Time Warner's violation of the North Carolina Antitrust Act as set forth above.

175.    If the Court determines that the Federal Class cannot be certified, Plaintiff Steinke and the members of the North Carolina Subclass incorporate by reference the allegations of Count I of this Complaint as if fully set forth herein, on behalf of all members of the North Carolina Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

## COUNT IX
### The West Virginia Subclass
### (Violation Of The West Virginia Antitrust Act – Unlawful Tying)

176.    Plaintiff Mitchell incorporates by reference the preceding paragraphs as if fully set forth herein.

177.    The West Virginia Antitrust Act makes it unlawful to enter into a contract in restraint of trade or commerce. W. Va. Code §§ 47-18-1, *et seq.* The Legislature has granted a private right of action to individuals harmed by violations of this Act. W. Va. Code §§ 47-18-9.

178.    As set forth herein, Time Warner has violated W. Va. Code § 47-18-1, in conditioning the sale of Premium Cable Service upon the lease of a cable box from Time Warner.

179.    At all times relevant hereto, Time Warner has maintained, and exerted sufficient economic and market power to coerce Plaintiff and the West Virginia Subclass to pay rent for the cable box and accept the tied products.

180.    Plaintiff, on his own behalf and on behalf of the West Virginia Subclass, seeks to recover damages they suffered as a result of Time Warner's violation of the West Virginia Antitrust Act.

181.    If the Court determines that the Federal Class cannot be certified, Plaintiff Mitchell and the members of the West Virginia Subclass incorporate by reference the allegations

of Count I of this Complaint as if fully set forth herein, on behalf of all members of the West Virginia Subclass and seek all relief requested under federal law as set forth in Count I of this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for a judgment against Defendant as follows:

(a) For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as representatives of the Class, and appointing the law firms representing Plaintiffs as counsel for the Class, and approving the creation of Subclasses as set forth above;

(b) For an order that Time Warner has violated Section 1 of the Sherman Anti-Trust Act and enjoining further violation;

(c) For an order that Time Warner has violated the respective state laws alleged by the Subclasses and enjoining further violation;

(d) For all recoverable compensatory and other damages sustained by Plaintiffs, the Class and the Subclasses;

(e) For all statutory damages and penalties available under the claims asserted;

(f) For payment of costs of suit herein incurred;

(g) For both pre-judgment and post-judgment interest on any amounts awarded;

(h) For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

(i) For such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs request a trial by jury in all issues so triable.

Date:   April 17, 2009

Respectfully submitted,

Robert I. Harwood
Peter W. Overs, Jr.
HARWOOD FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**LIAISON COUNSEL**

John F. Edgar
John M. Edgar
Daniel R. Young
Michael D. Pospisil
EDGAR LAW FIRM LLC
1032 Pennsylvania Ave.
Kansas City, MO 64105
Telephone: (816) 531-0033
Facsimile:  (816) 531-3322

**LEAD COUNSEL**

James C. Shah
SHEPHERD FINKELMAN MILLER & SHAH
LLC
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883

James E. Miller
Patrick A. Klingman  (PK-3658)
SHEPHERD FINKELMAN MILLER & SHAH
LLC
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120

John H. Donboli
DEL MAR LAW GROUP LLP
322 Eighth Street, Suite 105
Del Mar, CA 92014
Telephone: (858) 793-6244
Facsimile: (858) 724-1490

William M. Sweetnam
SWEETNAM LLC
10 South LaSalle Street, Suite 3500
Chicago, IL 60603
Telephone: (312) 346-5100
Facsimile: (312) 606-0027

Debra Clark-Weintraub (DW-6877)
Joseph Whatley, Esquire
WHATLEY, DRAKE & KALLAS
1540 Broadway, 37th Floor
New York, NY 10036
Telephone: (212) 447-7070
Facsimile: (212) 447-7077

Stephen A. Corr
Thomas E. Mellon, Jr.
MELLON, WEBSTER & SHELLY
87 N. Broad Street
Doylestown, PA 18901
Telephone: (215) 348-7700
Facsimile: (215) 348-0171

John A. Corr
LAW OFFICE OF JOHN A. CORR
301 Richard Way
Collegeville, PA 19426
Telephone: (610) 482-4237
Facsimile: (610) 422-3913

John W. Barrett, Esq.
Michael L. Murphy, Esq.
BAILEY & GLASSER
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

Dennis Pantazis
WIGGINS, CHILDS, QUINN & PANTAZIS
The Kress Building
301 - 19th Street North
Birmingham, Alabama 35203
Telephone: (205)314-0500
Facsimile: (205) 254-1500

Robert Foote
FOOTE, MEYERS, MIELKE & FLOWERS, LLC
28 North First Street, Suite 2
Geneva, Illinois 60134
Telephone: (630) 232-6333
Facsimile: (630) 845-8982

Mark Gray
FRANKLIN GRAY AND WHITE
The Speed Mansion
505 W. Ormsby Avenue
Louisville, KY 40203
Telephone: (502) 637-6000
Facsimile: (502) 637-1413

Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813


Counsel for Plaintiffs

## Service List

| District Courts | |
|---|---|
| United States District Court<br>Western District of Missouri<br>Office of the Clerk<br>Charles Evans Whittaker Courthouse<br>400 East Ninth Street<br>Kansas City, MO 64016 | United States District Court<br>Southern District of California<br>Office of the Clerk<br>880 Front Street, Suite 4290<br>San Diego, CA 92101-8900 |
| United States District Court<br>Northern District of California<br>Office of the Clerk<br>450 Golden Gate Avenue, 16th Floor<br>San Francisco, CA 94102 | United States District Court<br>District of Kansas<br>Office of the Clerk<br>500 State Avenue<br>259 U.S. Courthouse<br>Kansas City, KS 66101 |
| United States District Court<br>Central District of California<br>Office of the Clerk<br>312 N. Spring Street, Room G-8<br>Los Angeles, CA 90012 | United States District Court<br>Southern District of New York<br>Office of the Clerk<br>Daniel Patrick Moynihan<br>U.S. Courthouse<br>500 Pearl Street<br>New York, NY 10007 |
| **Defendants** | |
| Margaret M. Zwisler<br>Latham & Watkins LLP<br>555 11th Street NW, Suite 1000<br>Washington, DC 20004<br>Telephone: (202) 637-2200<br>Facsimile: (202) 637-2201 | |
| **Plaintiffs** | |
| John H. Donboli<br>Del Mar Law Group LLP<br>322 Eighth Street, Suite 105<br>Del Mar, CA 92014<br>Telephone: (858) 793-6244<br>Facsimile: (858) 724-1490<br>jdonboli@delmarlawgroup.com | James C. Shah<br>Shepherd Finkelman Miller & Shah LLP<br>35 East State Street<br>Media, PA 19063<br>Telephone: (610) 891-9880<br>Facsimile: (610) 891-9883<br>jshah@sfmslaw.com |

William M. Sweetnam
Sweetnam LLC
10 South LaSalle Street, Suite 3500
Chicago, IL 60603
Telephone: (312) 346-5100
Facsimile: (312) 606-0027
wms@sweetnamllc.com

Robert I. Harwood
Peter W. Overs, Jr.
Harwood Feffer LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630
povers@hfesq.com