USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-8-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

IN RE: SET-TOP CABLE TELEVISION
BOX ANTITRUST LITIGATION

08 MD 1995

Lead Case:
08 Civ. 7616 (PKC)

MEMORANDUM
AND ORDER

-------------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.

       Twelve individuals bring this action individually and on behalf of a class against

Time Warner Cable Inc. ("Time Warner").  Each is a subscriber to Time Warner's Premium

Cable Services.  This Court previously granted Time Warner's motion to dismiss the plaintiffs'

First Amended Consolidated Class Action Complaint.  In re Time Warner Inc. Set-Top Cable

Television Box Antitrust Litigation, 2010 WL 882989 (S.D.N.Y. Mar. 5, 2010) (the "2010

Opinion").  The Third Amended Consolidated Class Action Complaint (the "Complaint") asserts

that Time Warner violated the Sherman Act, 15 U.S.C. § 1, by unlawfully tying subscriber

access to its premium services with mandatory rentals of its cable boxes.  Time Warner now

moves to dismiss the Complaint.

       For the reasons explained below, I conclude that the Complaint has adequately

alleged product and geographic markets.  While having plausibly alleged the required markets,

the Complaint alleges a theory of market power that is conclusory and based on allegations that

are inconsistent with or unrelated to the Complaint's own market definitions.  Because the

plaintiffs have failed to plausibly allege Time Warner's market power, the defendant's motion to

dismiss is granted.

BACKGROUND

For the purposes of the defendants' motion, all nonconclusory factual allegations are accepted as true. Matson v. Bd. of Educ. Of City School Dist. of N.Y., 631 F.3d 57, 63 (2d Cir. 2011); see also Iqbal v. Ashcroft, 129 S. Ct. 1937, 1949-50 (2009). As the non-movants, all reasonable inferences are drawn in favor of the plaintiffs. Matson, 631 F.3d at 63.

A. The Competitive Landscape for Premium Cable Services.

Time Warner provides customers with "Premium Cable Services," which the Complaint defines as "digital cable services incorporating interactive functions," including interactive program guides, pay-per-view sports programming, music, pay-on-demand programming (including adult content and recent feature films), and free programs. (Compl. ¶¶ 33-34, 57.) These Premium Cable Services are different from other categories of programming offered by Time Warner. (Compl. ¶¶ 29, 31-33.) They utilize a "bi-directional" or "interactive" video delivery system by which a customer requests content and Time Warner relays that content to the customer. (Compl. ¶ 37.) A Time Warner customer may access Premium Cable Services only through a cable box leased directly from Time Warner. (Compl. ¶¶ 41-42, 44.) The Complaint asserts that Premium Cable Services are the tying product and cable boxes are the tied product. (Compl. ¶¶ 40, 43-44.)

Time Warner, and other providers of subscription-based television, are known as "multichannel video programming distributors" ("MVPDs"). (Compl. ¶ 28.) The Complaint identifies three categories of MVPDs. In addition to traditional cable companies like Time Warner, so-called "Overbuilders" provide land-based MVPD services using preexisting fiber-

optic networks,[1] and satellite television companies provide Direct Broadcast Satellite ("DBS")

MVPD services.  (Compl. ¶¶ 62, 66.)  The major cable MVPDs do not compete against one

another directly, and instead operate in their own geographically divided local markets,

sometimes with competition from Overbuilders or smaller cable MVPDs.  (Compl. ¶ 79.)  As of

2009, cable companies had a national market share of 65%, DBS companies had a share of 25%,

and the Overbuilders had a share of 11%.  (Compl. ¶ 105.)

Overbuilders transmit programming through fiber optic lines already used for

telephone communications, and offer bi-directional services that are highly similar to Time

Warner's Premium Cable Services.  (Compl. ¶ 64-65.)  Overbuilders' markets are limited to

specific geographic areas based on existing fiber optic lines.  (Compl. ¶ 81.)  The two largest

Overbuilders are AT&T and Verizon, which, respectively, market services under the brand

names "U-verse" and "FiOS."  (Compl. ¶ 63.)  Other companies – both traditional cable

providers and fiber-optic based Overbuilders – have attempted to enter the MVPD market, but

have struggled to make market inroads or have failed.  (Compl. ¶¶66-68.)  In certain markets,

FiOS and/or U-verse compete directly with Time Warner.  (Compl. ¶¶ 81, 87-88, 97-98.)

By contrast, because it employs satellite signals, the market for DBS services is

not geographically limited.  (Compl. ¶¶ 69, 84.)  The DBS providers have their strongest

presence in rural markets because physical structures in suburban and urban areas often obstruct

clear satellite reception.  (Compl. ¶¶ 84-85, 107.)  The most prominent DBS providers are Dish

Network and DIRECTV.  (Compl. ¶ 69.)  As of 2009, Dish Network and DIRECTV had a

combined 32.66 million subscribers.  (Compl. ¶¶ 103-04.)  DBS providers send signals directly

---

[1] At times, the parties use "overbuilders" as shorthand for all land-based programming providers, including both cable and fiber-optic based companies.  The Court uses the term "Overbuilders" to refer to telephone companies that provide television programming; this is the sense in which the term is most often employed in the plaintiffs' submissions.

from a satellite to a subscriber's receiver, but because the receiver does not communicate

information back, the one-way transmission process does not allow for the interactive functions

used in Premium Cable Services. (Compl. ¶¶ 70-71.) According to plaintiffs, the Dish Network

and DIRECTV have been planning to offer services "that mimic bi-directional cable services" by

letting customers order content through an internet connection. (Compl. ¶ 72.) According to the

Complaint, content delivered through the internet is not comparable in quality and ease of use to

content delivered by cable television, due to variability in bandwidth strength and lower video

quality. (Compl. ¶ 72.) Plaintiffs also contend that DBS providers offer a different product,

because they do not "bundle" services in a single product the way that cable providers do.

(Compl. ¶ 74.)

       Plaintiffs identify internet-based services as a third category of video-content

providers. (Compl. ¶ 75.) As described in the Complaint, these services "have not been widely

available until very recently," and their quality is limited due to content limitations and variable

bandwidth strength. (Compl. ¶ 75.) Additionally, plaintiffs claim that the physical distribution

of video programming through disc-based rentals is not comparable to the consumer choice and

convenience of Premium Cable Services. (Compl. ¶ 76.)

       According to the plaintiffs, the product market for Premium Cable Services

consists of specified programming from cable MVPDs and the Overbuilders, specifically

including FiOS and U-verse. (Compl. ¶ 77.) Plaintiffs contend that there is a low cross-

elasticity of demand between the land-based MVPDs – both cable companies and the fiber optic-

based Overbuilders – and the DBS services. (Compl. ¶ 77.) They also contend that the

development of internet-based video services has not affected the prices of cable subscriptions,

and that such services "complement," rather than plausibly substitute, Premium Cable Services. (Compl. ¶ 77.)

B. Time Warner's Use of Digital Cable Boxes, and the Alleged Tying Arrangements.

Time Warner purchases cable boxes directly from manufacturers – specifically, Scientific Atlanta, Motorola and Samsung – at a fixed cost, and then rents those boxes to customers. (Compl. ¶ 108-09.) Time Warner customers may not, themselves, purchase boxes, because the boxes must first be initialized and programmed to work with Time Warner's protocol. (Compl. ¶ 110.) As characterized by the plaintiffs, "consumers suffer" from Time Warner's requirement that consumers lease boxes and that they do so only from Time Warner. (Compl. ¶ 120.) Were it not for this requirement, which the plaintiffs allege amounts to an unlawful tying arrangement, consumers could purchase a cable box from a manufacturer and use it to access Premium Cable Services. (Compl. ¶ 122.) But because the products are tied, consumers are compelled to rent cable boxes at a "significantly larger sum of money . . . ." (Compl. ¶ 123.)

According to the Complaint, for a Time Warner subscriber of Premium Cable Services, there is no possible substitute for a Time Warner-leased cable box. Time Warner permits consumers to receive programming via a CableCARD, but, much like the DBS systems, a CableCARD allows only one-way communications from the cable provider to the consumer. (Compl. ¶ 5.) As a consequence, a Time Warner customer who receives programming via a CableCARD is unable to access Premium Cable Services. (Compl. ¶¶ 5-7, 41.) In addition, a Time Warner customer who wishes to use a CableCARD must lease the card from Time Warner on a monthly basis and pay the company an installation charge. (Compl. ¶¶ 49.)

Separately, some television manufacturers sell "cable ready" televisions, which allow a consumer to receive some cable services without the use of a cable box or any other device; a consumer cannot, however, access Premium Cable Services through a "cable ready" television. (Compl. ¶¶ 30, 41.) Because CableCARDS and cable-ready televisions do not have two-way capabilities, the Complaint alleges, subscribers may access Premium Cable Services only by renting a cable box directly from Time Warner. (Compl. ¶¶ 41-43.) Therefore, a customer without a cable box may subscribe to Time Warner's higher-tier packages in order to receive digital cable services via CableCARD or a cable-ready television, but remain unable to access the Premium Cable Services "for which he or she has paid . . . ." (Compl. ¶ 47.)

C. Procedural History.

On December 15, 2008, the United States Judicial Panel on Multidistrict Litigation ordered, pursuant to 28 U.S.C. § 1407, the centralization of various actions alleging Time Warner's unlawful tying of cable boxes and Premium Cable Services. (Docket # 1.) The actions were transferred to the undersigned. (Docket # 1.) On April 17, 2009, plaintiffs filed a First Amended Consolidated Class Action Complaint (the "First Amended Complaint"). (Docket # 19.) The defendant moved to dismiss, and the Court issued the 2010 Opinion, granting the defendant's motion with leave to replead. In re Time Warner Inc., 2010 WL 882989.

The 2010 Opinion concluded that the plaintiffs failed to plead actual coercion as to the alleged tying arrangement. Id. at *5-6. The First Amended Complaint acknowledged that CableCARDS were available to Time Warner customers as an alternative to leasing a cable box. Id. at *5. The pleading did not, however, allege that Time Warner barred customers from using CableCARDS purchased by third parties or that Time Warner charged a supplemental fee for

their use. Id. The 2010 Opinion noted that a CableCARD user could access certain "secured channels, such as HBO, Cinemax, and Showtime" via a CableCARD, whereas two-way video services would remain unavailable to CableCARD users. Id. at *7-8. The Court noted that the First Amended Complaint did not allege two-way cable services as a separate product market, or address "the fixed period" of 2004 to 2008, which is the relevant timeframe under the First Amended Complaint. Id. at *8-9. The Court explained that:

> It may be that there is a tying product or service, i.e. Premium Cable Services with two-way communications so as to permit on-demand or pay-per-view service, and a tied product, i.e., cable boxes permitting such two-way communications. The absence of a viable alternative to such a tied product within the relevant markets may enable plaintiffs to plead a viable claim of actual coercion.

Id.[2] After concluding that the Amended Complaint had failed to allege actual coercion, the Court left open the possibility that the plaintiffs might amend their complaint to set forth additional allegations as to the availability of two-way technology for satellite and fiber optic-based programming providers, as well as the geographic markets where any such competitor services are present. Id. at *9.

At a pretrial conference on July 6, 2010, after plaintiffs filed a Second Amended Consolidated Class Action Complaint, defense counsel raised, among other things, the variations in Time Warner's local markets and the implications for alleging market power. (July 6, 2010 Tr. at 16-17.) I granted plaintiffs further leave to replead and file the Third Amended Consolidated Class Action Complaint that is subject to this motion. (Id. at 27-29.)

MOTION TO DISMISS STANDARD

---

[2] The previous Amended Complaint used a broader definition of Premium Cable Services than is alleged here, including "premium/optional channels" and "optional subscription channels," such as HBO and Showtime. (Am. Compl. ¶ 44.)

Rule 8(a)(2), Fed. R. Civ. P., requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (ellipsis in original). In Twombly, which arose in the context of a claim brought under section 1 of the Sherman Act, the Supreme Court held that to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must provide the grounds upon which the claims rest, through factual allegations sufficient to raise a right to relief above the speculative level. Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" do not suffice to state a claim, as "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1949-50. As Twombly explained, in the antitrust context, "'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" 550 U.S. at 558 (quoting Associated Gen. Contractors of Cal., Inc. v. Carpenters, 439 U.S. 519, 528 n.17 (1983)). Even prior to Twombly, the Second Circuit held that, at the Rule 12(b)(6) stage, "an antitrust defendant charged with illegal tying is entitled to some specificity as to the conduct alleged to be coercive, the customers who would have purchased a product elsewhere but for the coercion, the particular products sold as a result of the coercion, the anticompetitive effects in a specified market, and the effect on the business of the plaintiff." E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 32 (2d Cir. 2006).

The Supreme Court has described the motion to dismiss standard as encompassing a "two-pronged approach" that requires a court first to construe a complaint's allegations as true, while not accepting the veracity of a legal conclusion couched as a factual allegation. Iqbal, 129 S. Ct. at 1950. Second, a court must consider whether the complaint "states a plausible claim for relief," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

DISCUSSION

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 461 (1992) (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958)). Plaintiffs asserting an illegal tying arrangement must plausibly allege "first, a tying and a tied product; second, evidence of actual coercion by a seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a 'not insubstantial' amount of interstate commerce in the 'tied' market." E & L Consulting, 472 F.3d at 31 (quoting DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984), abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 31 (2006).

A.  The Complaint Adequately Alleges a Geographic Market.

A Sherman Act complaint must allege a relevant product market and geographic

market.  Todd v. Exxon Corp., 275 F.3d 191, 200, 206 (2d Cir. 2001); Arista Records LLC v.

Lime Group LLC, 532 F. Supp. 2d 556, 575 (S.D.N.Y. 2007) (Lynch, J.).  The 2010 Opinion

noted that "it is incumbent upon plaintiff to plausibly define . . . geographic markets or

submarkets."  2010 WL 882989, at *9.  The Second Circuit has described the requirements of

defining a geographic market as follows:

> Courts generally measure a market's geographic scope, the 'area of
> effective competition,' by determining the areas in which the seller
> operates and where consumers can turn, as a practical matter, for
> supply of the relevant product. This approach evaluates the
> geographic aspect of the elasticity of a specified market – that is,
> how far consumers will go to obtain the product or its substitute in
> response to a given price increase and how likely it is that a price
> increase for the product in a particular location will induce outside
> suppliers to enter that market and increase supply-side competition
> in that location.

Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227 (2d Cir. 2006) (citations omitted).

"[C]ourts have held that the market for certain entertainment services – such as, for example,

tickets to movie theater showings – is local or regional."  Id. at 228 (collecting cases).  Unless a

geographic market is alleged "with precision," it is "impossible" to assess potential harms arising

from the alleged misconduct.  Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 483 (S.D.N.Y.

2001).  For instance, a complaint does not plausibly allege a geographic market when it asserts

both a narrow local market and a nationwide market.  Id.  At the same time, "Congress

prescribed a pragmatic, factual approach to the definition of the relevant market and not a

formal, legalistic one."  Brown Shoe Co. v. United States, 370 U.S. 294, 336 (1962).  The

geographic market must "both correspond to the commercial realities of the industry and be

economically significant."  Id. at 336-37 (quotation marks omitted).

According to the plaintiffs, Time Warner provides cable services in 21 states. (Compl. ¶ 86.)  The Complaint identifies 53 specific local markets where Time Warner operates. (Compl. ¶ 86.)  For instance, Time Warner is alleged to provide cable services to one entire state (Hawaii), but it otherwise provides cable services to discrete municipalities and regions within a state (e.g., Bangor, Maine or Lincoln, Nebraska).  (Compl. ¶ 86.)  Certain of the markets are alleged to cover broader regional swaths – for instance, the market for "Albany-Schenectady-Troy" is defined as "including Saratoga-Glens Falls & Pittsfield, MA," and the market for New York City includes "parts of New Jersey."  (Compl. ¶ 86.)

The Complaint asserts that Time Warner's competition varies across these local markets.  While "[t]he major cable MVPDs, including Time Warner," do not compete against one another in a given geographic area, smaller regional cable companies may have a presence. (Compl. ¶ 79-80.)  Plaintiffs allege that the Overbuilders – U-verse and FiOS – compete against Time Warner in several local markets, including New York, Los Angeles, Kansas City and elsewhere.  (Compl. ¶ 87.)  Because DBS services, such as DTV and DISH, do not have the infrastructure demands of cable companies and Overbuilders, they have no geographic limitations.  (Compl. ¶ 83.)  DBS services predominate, however, in rural areas, which are not served by cable companies or overbuilders, and where the satellite dishes have better access unobstructed signals.  (Compl. ¶¶ 84-85.)

In their opposition memorandum, the plaintiffs state that "[t]he Complaint alleges the relevant geographic market is the collective of the markets in which TWC does business." (Opp. at 9.)  Plaintiffs further asserts that Time Warner "enjoys the market power to compel its customers to lease cable boxes not on a national level, or on a purely local level, but in each of the markets in which it does business," and states that the Complaint has alleged "distinct

submarkets based upon the purported competitive differences between its various local markets . . . ." (Opp. at 10.)

The text of the Complaint does not, as the plaintiffs assert in their memorandum, define the relevant geographic market as "the collective" of markets in which Time Warner does business.[3]  It does, however, describe Time Warner's presence in several separate and discrete local markets.  (See, e.g., Compl. ¶ 79 ("The major cable MVPDs, including Time Warner, do not compete against each other in any given geographic market.  Instead, each cable MVPD operates in its own geographically divided local markets."); ¶ 80 ("Class members, and all other current and potential cable television subscribers in a Time Warner market, do not have the choice to purchase cable television services from another major cable company."); ¶¶ 86-89 (delineating competitive landscape of discrete geographical markets).)  It also, as previously noted, asserts that Time Warner does business in 53 local markets in 21 states, all of which are identified in the Complaint.  (Compl. ¶ 86.)

The Complaint plausibly alleges a geographic market for Premium Cable Services in specific local markets.  A Time Warner subscriber in one particular locality may have the option to subscribe to Premium Cable Services from an Overbuilder such as Verizon or AT&T, while a Time Warner subscriber in another locality may be limited to subscribing to Time Warner's Premium Cable Services or to DBS services like DTV or DISH.  A Time Warner customer in, for example, Lincoln, Nebraska would be unable to subscribe to the U-verse offerings available in Kansas City or the FiOS offerings available in New York City (Compl. ¶¶

---

[3] Plaintiff relies upon the following allegations:  "In those markets controlled by Time Warner, Time Warner's control over all cable television services naturally gives Time Warner control over Premium Cable Services." (Compl. ¶ 60); "Time Warner currently provides cable video programming services and leases cable boxes in communities, or clusters of communities, in several states." (Compl. ¶ 86); "Because of Time Warner's market power, the Class is forced to pay rental fees for the cable box in addition to fees for Premium Cable Services and is deprived of the option to purchase the cable box in a free and open market or even directly from Time Warner or its suppliers." (Compl. ¶ 149.)

86-89), and would therefore have a more limited (or perhaps non-existent) opportunity to seek out a substitute product in response to a price increase for Premium Cable Services. As with the markets for movie tickets, <u>Heerwagen</u>, 435 F.3d at 228, or pro football tickets, <u>Coniglio v. Highwood Services, Inc.</u>, 495 F.2d 1286, 1291 (2d Cir. 1974), a consumer's options for Premium Cable Services will necessarily be determined by local market conditions.

Plaintiffs identify numerous distinct, local markets where Time Warner operates, and alleges competitive variations between the conditions of each. In so alleging, the Complaint asserts that the relevant market in this case consists of numerous discrete, regional markets, with competitive variations in each market. Hence, in all but label, the Complaint alleges a collective of regional submarkets.

At the pleading stage, this is consistent with alleging a plausible geographic market based on a pragmatic, factual approach, <u>Brown Shoe</u>, 370 U.S. at 336, and is not unduly vague or contradictory, as were the geographic market allegations in <u>Mathias</u>, 152 F. Supp. 2d at 483.

B. The Complaint Alleges a Product Market of Premium Cable Services.

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." <u>Todd</u>, 275 F.3d at 200 (internal citation and quotation marks omitted). "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." <u>AD/SAT, Div. of Skylight, Inc. v. Associated Press</u>, 181 F.3d 216, 227 (2d Cir. 1999).

Definition of the relevant product market often requires "a deeply fact-intensive inquiry," and courts are hesitant to grant motions to dismiss for failure to plead a relevant market definition. Todd, 275 F.3d at 199-200. At the same time, when a proposed product market "'clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss must be granted.'" Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008) (quoting Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)). Any limit placed on the relevant market must be at least "theoretically reasonable . . . ." Id. "'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" Coniglio, 495 F.2d at 1292 (quoting Brown Shoe Co., 370 U.S. at 325). An analysis of the relevant product market "must recognize meaningful competition where it is found to exist," and may encompass "'well-defined submarkets, which, in themselves, constitute product markets for antitrust purposes.'" United States v. Continental Can Co., 378 U.S. 441, 449 (1964) (quoting Brown Shoe, 370 U.S. at 325).

"Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Todd, 275 F.3d at 200 (collecting cases). For example, a particular athletic team, pizza brand or Broadway show does not constitute its own market. Id. at 200 n.3; see also Global Discount Travel Services, LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 705 (S.D.N.Y. 1997) ("A consumer might choose to purchase a certain product because the manufacturer has spent time and energy

differentiating his or her creation from the panoply of products in the market, but at base, Pepsi

is one of many sodas, and NBC is just another television network.") (Sotomayor, J.).  On the

other hand, an overly broad product definition may render the alleged product market

implausible.  See Coniglio, 495 F.2d at 1292  (assigning "plays, movies, and musicals . . . within

the boundaries of the same product market as exhibition football" goes "far beyond that ever

contemplated for a relevant product market.")

      At the pleading stage, courts often have concluded that seemingly narrow market

definitions in the media and entertainment industry are nevertheless plausible.[4]  In Arista

Records, 532 F. Supp. 2d at 576, then-District Judge Lynch concluded that plaintiffs adequately

pleaded a relevant product market for "the digital distribution of copyrighted music over the

internet," distinguishing it from the markets for compact discs and audiocassettes because "such

physical products are not readily compatible with consumers' preferences and expectations

regarding the portability, arrangement, and playing of music."  Arista concluded that the

differences between the products "provide at least a 'plausible' reason why consumers would not

respond to a 'slight increase' in the prices charged by digital distributors by switching to physical

products . . . ."  Id.  In New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.,

651 F. Supp. 802, 805 (S.D.N.Y. 1986), plaintiffs alleged monopolization in "the market for pay

cable movie and non-sports entertainment programming service in lower Manhattan."  Judge

Sweet held that this alleged a relevant product market.  Id. at 806-08 (internal citation omitted).

      In Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 994-95 (9th

Cir. 1986), the Ninth Circuit concluded, at the summary judgment stage, that a reasonable jury

could view "industry anticipated top-grossing films" as a distinct product market from "other

---

[4] Nat'l Ass'n of Theatre Owners v. FCC, 420 F.2d 194, 204 (D.C. Cir. 1969), which involved FCC regulatory issues, observed in dictum that "entertainment is an industry in which antitrust concepts such as product market and cross-elasticity of demand are exceptionally difficult to apply . . . ."

first run films . . . ." The record in <u>Syufy</u> indicated that industry-anticipated, top-grossing films,

numbering approximately 30 releases per year, "have larger budgets, 'name' stars and directors,

larger advertising budgets, command large guarantees, and possess other distinctive

characteristics which can be identified before the film is released." <u>Id.</u> at 994-95. "In more

colloquial terms, the viability of the proposed definition depends on the argument that if the price

for admission to <u>E.T.</u> goes up, audiences will not flock to <u>My Dinner with Andre</u>." <u>Id.</u> Such

distinctions were sufficient to allege a product market. <u>See also</u> <u>Movie 1 & 2 v. United Artists</u>

<u>Communications, Inc.</u>, 909 F.2d 1245, 1248 & n.2 (9th Cir. 1990) (noting relevant product

market of "first-run motion pictures," as opposed to less profitable "sub-run" films). By

contrast, the cable channels ESPN and TNT have been held not to be their own relevant product

markets, <u>TV Communications Network, Inc. v. ESPN, Inc.</u>, 767 F. Supp. 1062, 1071 (D. Colo.

1991), and in <u>Theatre Party Associates, Inc. v. Shubert Organization, Inc.</u>, 695 F. Supp. 150,

153-54 (S.D.N.Y. 1988), Judge Leisure concluded that "advance sales of selected tickets to the

early run of Phantom [of the Opera]" in the 1987-88 season did not constitute its own relevant

product. <u>Accord</u> <u>Carell v. Shubert Org., Inc.</u>, 104 F. Supp. 2d 236, 265 (S.D.N.Y. 2000)

(complaint failed to allege that "Broadway shows or other forms of entertainment are not

reasonably interchangeable with products associated with <u>Cats</u>.")

   Here, the Complaint defines "Premium Cable Services" as "digital cable services

incorporating interactive functions," including two-way technology, interactive program guides,

parental control devices, pay-per-view sports programming, adult programming, music, pay-on-

demand programming (including recent feature films), and free programs. (Compl. ¶¶ 33-34.) It

later defines Premium Cable Services as "cable MVPD service with bi-directional services,

including interactive program guides, pay-per-view programming for sporting events and movies

which are not available through other channels, and programming on demand." (Compl. ¶ 57.)

By contrast, basic cable subscribers "receive a limited number of local and national channels for

a monthly fee." (Compl. ¶ 29.)  At different tiers of service, customers pay more for their

subscriptions, and, correspondingly, they receive more channels.  (Compl. ¶¶ 29, 31.)  Because

of the unique viewing options accessible via two-way programming, Premium Cable Services

are alleged to be a different product from lower tiers of cable service.  (Compl. ¶¶ 29, 31-35.)

   According to the Complaint, Time Warner's subscribers of Premium Cable

Services select from a library of both free and priced programming, "without the need to access

any other device or leave his or her couch." (Compl. ¶ 59.)  Many of the Premium Cable

Services are supplied by iN Demand LLC, which is owned by subsidiaries of Time Warner,

Comcast Corporation and Cox Communications, Inc., and which also supplies services to

fourteen other cable companies.  (Compl. ¶ 36.)  Plaintiffs allege upon information belief that

"virtually zero" consumers receiving basic cable from one MVPD purchase higher-tier services

from another MVPD.  (Compl. ¶ 61.)  Subscribers to the Overbuilders, including Verizon's FiOS

or AT&T's U-verse, access features comparable to those available to a Premium Cable Service

subscriber.  (Compl. ¶¶ 62-66.)  By contrast, subscribers to DBS services do not have access to

two-way technologies comparable to Premium Cable Services.  (Compl. ¶¶ 69-71.)

   Separately, the Complaint attempts to distinguish Premium Cable Services from

internet video content providers and the physical distribution of video programming.  (Compl. ¶¶

75-76.)  Plaintiffs assert that internet video is limited by a lack of convenience, variable

bandwidth quality, and content limitations, and that no single internet video provider offers the

range of content available through Premium Cable Services.  (Compl. ¶ 75.)  Physical, disc-

based video use is alleged to be less convenient and not to offer comparable consumer choice. (Compl. ¶ 76.)

As the Second Circuit cautioned in Todd, the market definition in this case requires "a deeply fact-intensive inquiry . . . ." 275 F.3d at 199.  According to the Complaint, cable MVPDs and the Overbuilders offer products that satisfy the Complaint's definition of Premium Cable Services.  This is not an instance where the relevant product market has been limited to Time Warner-specific services.  The Complaint has, at the pleading stage, articulated a plausible explanation as to why internet-based video delivery systems are not substitutable for Premium Cable Services, even though the defendant contends that internet-video providers like Netflix and Apple, as well as the DBS broadband-based programming, provide an adequate substitute for Premium Cable Services.  (Def. Mem. at 11.)  As alleged in the Complaint, however, these possible alternatives require high-speed internet access, whereas, by contrast, the MVPDs and Overbuilders provide Premium Cable Services using the same lines and descramblers that come with a subscription.  The Complaint also alleges that internet streaming does not compete with Premium Cable Services because the quality of internet connections is variable and prone to interruption.

At the summary judgment stage or at trial, it may be that these alleged differences between Premium Cable Services and internet-based video would be shown to be immaterial, and that a consumer would view one as an adequate substitute for another.  But, at the pleading stage, a plaintiff is required to set forth a product that competes with potential substitutes, and to set forth a plausible explanation as to why a market should be limited in a particular way.  Todd, 275 F.3d at 200.  Here, the Complaint has articulated a plausible reason why its market definition does not include programming available for instant streaming over the internet, and why

Premium Cable Services provided by cable companies and Overbuilders constitute a separate market.

### C. The Complaint Fails to Plausibly Allege Market Power and/or Adverse Competitive Effect.

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." Illinois Tool Works, 547 U.S. at 46. A defendant must have "appreciable economic power in the tying market," with market power defined as "the power 'to force a purchaser to do something that he would not do in a competitive market.'" Eastman Kodak, 504 U.S. at 464 (quoting Jefferson Parish, 466 U.S. at 14); see also Park v. Thomson Corp., 2007 WL 119461, at *7 (S.D.N.Y. Jan. 11, 2007) (collecting cases on market power's necessity to successful tying claims).

"One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of that market." Todd, 275 F.3d at 199; accord Eastman Kodak, 504 U.S. at 464. In the context of monopolization claims brought under section 2 of the Sherman Act, "the higher the market share, the stronger is the inference of monopoly power." Broadway Delivery Corp. v. United Parcel Service of America, Inc., 651 F.2d 122, 129 (2d Cir. 1981).

Alternatively, "'[i]f a plaintiff can show an actual adverse effect on competition . . . . we do not require a further showing of market power.'" Todd, 275 F.3d at 206-07 (internal citation omitted; ellipsis in original; quoting K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995)). "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for

detrimental effects.'" FTC v. Indiana Federation of Dentists, 476 U.S. 447, 460-61 (1986)

(quoting 7 P. Areeda, Antitrust Law ¶ 1511, at 429 (1986)).  Allegations of "a contemporaneous

rise in price with increased market share" may suffice.  Natsource LLC v. GFI Group, Inc., 332

F. Supp. 2d 626, 635 (S.D.N.Y. 2004); accord K.M.B. Warehouse, 61 F.3d at 129.  Market

power may also be determined by weighing the "'strength of the competition, the probable

development of the industry, the barriers to entry, the nature of the anticompetitive conduct and

the elasticity of consumer demand.'"  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90,

98 (2d Cir. 2001) (quoting Int'l Distribution Centers, Inc. v. Walsh Trucking Co., 812 F.2d 786,

792 (2d Cir. 1987)).

       Plaintiffs' plausible product and geographic market definitions render as vague,

contradictory and implausible their allegations directed to market power.  An assessment of

market power must be grounded in the relevant product market.  PepsiCo, Inc. v. Coca-Cola Co.,

315 F.3d 101, 108 (2d Cir. 2002) ("In the absence of direct measurement of a defendant's ability

to control prices or exclude competition, however, market power necessarily must be determined

by reference to the 'area of effective competition' – which, in turn, is determined by reference to

a specific, defined 'product market.'").  In attempting to allege market power, the Complaint

conflates Time Warner's provision of Premium Cable Services with its provision of all cable

programming.  It also fails to account for the expressly alleged variations in the local markets

that collectively constitute the geographic market.

       As to both product market and market power, the Complaint asserts as follows:

> Although the tiers of service are vertically differentiated, the
> provision of Premium Cable Services relies upon the same basic
> infrastructure as basic cable services.  In those markets controlled
> by Time Warner, Time Warner's control over all cable television
> services naturally gives Time Warner control over Premium Cable
> Services.

(Compl. ¶ 60.)  Accepting the Complaint's product definition, Time Warner could wield market

control over "cable services" generally – which I interpret to mean control of the local MVPD

<u>cable</u> market, and not control over <u>all</u> MVPD services in that market[5] – but may still face robust

competition from the Overbuilders.  The Complaint's market power allegations conflate market

power in the provision of cable services (a broad category) as equivalent to market power in

Premium Cable Services (a narrower category).  It would be as if a plaintiff had adequately

alleged a product market consisting of orange juice, but relied on the defendant's position in the

overall beverage industry as evidence of market power.

The Complaint does assert that "the cable MVPD market" has been marked by

increasing consolidation.  (Compl. ¶¶ 90-91.)  In June 2009, as to all television subscription

packages, cable had a market share of 65 percent, DBS had 25 percent and the broadband

Overbuilders had 11 percent.  (Compl. ¶ 105.)  A 2009 FCC report also identified cable MVPD

as "the dominant force in the market . . . ."  (Compl. ¶ 106.)

The Complaint asserts that from 2006 to 2009, the number of Time Warner

subscribers receiving Premium Cable Services increased from 7.3 million to 8.9 million.

(Compl. ¶ 94.)  Plaintiffs allege that Time Warner has "maintained sufficient economic power in

the Premium Cable Services market to coerce Plaintiffs and the Class to lease and/or otherwise

accept the tied product (the cable box) that they would not otherwise lease or accept from Time

Warner."  (Compl. ¶ 150.)

---

[5] According to the Complaint, "each cable MVPD operates in its own geographically divided local markets."
(Compl. ¶ 79.)  With the exception of Premium Cable Services, the DBS companies provide programming
comparable to the programming provided by Time Warner and the Overbuilders.  (Compl. ¶¶ 69-73.)  If Paragraph
60 were construed to imply control over <u>all</u> MVPD subscription programming – meaning all programming that is
provided by cable companies, Overbuilders and DBS companies – it would be making an assertion that is
inconsistent with the balance of the Complaint.

At the same time that Time Warner has increased the number of Premium Cable Service subscriptions, according to the FCC, the average cost of a cable subscription has increased annually. (Compl. ¶ 101.) The plaintiffs allege that the nationwide "weighted average price of cable service" has increased by 163% since 1995. (Compl. ¶ 101.) This allegation is directed toward industry-wide price increases, however, and not to Time Warner's price increases – let alone Time Warner's price increases in the relevant market of Premium Cable Services. In addition, based on the allegations of the Complaint, Time Warner did not introduce Premium Cable Services until 2002, rendering the fifteen-year, 163% price increase of slightest relevance to market power. (Compl. ¶ 39.) The Complaint further alleges that in 2006, 2007, and 2008, "the cable industry" increased "[t]he average price of cable service (expanded basic plus digital) . . . by 5.8 percent, 4.7 percent, and 7.4 percent . . . ." respectively each year. (Compl. ¶ 101.) This allegation of increasing prices is an average that accounts for various packaging tiers, and does not allege price increase in the relevant product of Premium Cable Services. Moreover, it is again based on industry averages, and not Time Warner's increases. It would be as if a plaintiff had alleged a product market consisting of orange juice, but cited industry-wide price increases in beverage products as an indicia of market power.

Plaintiffs' allegations directed toward Time Warner's market power are based on overinclusive allegations going toward Time Warner's overall subscriptions, and not merely subscriptions to Premium Cable Services. If a contemporaneous rise in prices and market share suffices to allege market power, see Natsource LLC, 332 F. Supp. 2d at 635, and K.M.B. Warehouse, 61 F.3d at 129, plaintiffs have alleged only an increase in "[t]he average price of cable service (expanded basic plus digital)" occurring in tandem with an increase in the number of Premium Cable Service subscribers. Yet for the purpose of alleging market power, the

relevant consideration is whether the price of Premium Cable Service subscriptions rose at the same time that the number of subscribers grew, as opposed to an average price increase across multiple products.  The Complaint does not allege as much.

Similarly, having alleged that the relevant geographic market consists of the aggregate of local markets in which Time Warner does business, plaintiffs' allegations about market power treat the relevant geographic market as a national, uniform one, and do not account for local variations in the market for Premium Cable Services.  As acknowledged in the Complaint, "the only competitors offering the equivalent of Premium Cable Services are the Overbuilders, including FiOS and U-verse." (Compl. ¶ 95.)  The Overbuilder U-verse operates in Los Angeles, San Diego, Kansas City, Charlotte, Raleigh, Cleveland, Columbus, Dayton, Akron, Toledo, Austin, Corpus Christi, Dallas-Fort Worth, El Paso, San Antonio, Green Bay and Milwaukee, as well as Columbia, South Carolina and Greenville, North Carolina. (Compl. ¶ 87.)  FiOS operates in New York City, Buffalo, Dallas-Fort Worth and Newport News. (Compl. ¶ 87.)  Plaintiffs note that an additional Overbuilder, RCN Corp., operates in New York City. (Compl. ¶ 89.)  Based on the Complaint's allegations, then, Time Warner faces competition from Overbuilders in 22 of its 53 local markets. (Compl. ¶¶ 86-88.)

On the issue of market power, the Complaint recognizes no distinctions between these markets individually, or between these markets and any other in which Time Warner does business.[6]  According to the plaintiffs, as of November 2009, U-verse and Verizon had a total of

---

[6] In their opposition memorandum, the plaintiffs assert that Time Warner "only charges competitive prices in markets where there is a competing MVPD overbuilder, which is known to be less than 2% of the areas TWC services and which areas are specifically excluded from the Class (Compl. ¶¶ 99, 108, 131) . . . ." (Opp. Mem. at 14.)  The Complaint alleges no such thing, and the paragraph citations set forth in the opposition memo do not support the proposition.  In the First Amended Complaint of April 17, 2009, the plaintiffs explicitly excluded from their proposed class "those Time Warner customers who receive service at an address at which they may receive cable television service from at least one competing cable or fiber optic video service provider in addition to Time Warner . . . ." (Am. Compl. ¶ 27.)  The Third Amended Complaint that is subject to the pending motion contains no such exclusion in its proposed class definition. (Compl. ¶ 131.)

1 million subscribers in geographic markets "controlled by Time Warner." (Compl. ¶ 98.) Time Warner, by contrast, had a nationwide total of 8.9 million Premium Cable Services subscribers in 2009. (Compl. ¶ 94.) In the context of a geographic market comprised of numerous local markets, these figures do not shed meaningful light on market power. And once again, the allegations of the total number of Overbuilder subscribers are directed to total cable subscriptions, and not Premium Cable Services subscriptions. The Complaint does not allege Time Warner's Premium Cable Services market share in any of the individual geographic markets. As a result, the Complaint fails to allege either Time Warner's market share or its adverse effect on competition, either of which may suffice to allege market power. Todd, 275 F.3d at 206-07.

As Time Warner notes, it is at least theoretically possible that Time Warner could have a 100-percent market share for basic cable services, but in that same market, have a zero percent share of the market for Premium Cable Services. A less fanciful scenario, however, is that, accepting the truth of the allegations, Time Warner operates in an array of competitive environments. As noted, in Dallas-Fort Worth, Time Warner competes against both FiOS and U-verse. (Compl. ¶ 87.) It may be that a Dallas-Fort Worth consumer has multiple, easily accessible Premium Cable Services options, and, in response to price increases, could readily subscribe to an Overbuilder instead of maintaining a Time Warner subscription. Lincoln, Nebraska, by contrast is not alleged to have any Overbuilders in operation. It could be that Time Warner's market power in Lincoln is so dominant that a customer confronted with a price increase would be left with the option of paying a higher rate, or else ceasing to subscribe to Premium Cable Services. In such an instance, Time Warner might plausibly have a dominant position of market power. In yet other markets, where Time Warner competes against only one

Overbuilder, or where an Overbuilder is in the process of expanding, the levels of competition may be more variable still.[7]

The Complaint alleges these differences in the competitive landscape, but it fails to account for them in its theory of market power. Its market power allegations are made in the aggregate, in terms of annual price increases across a variety of products, and in blanket generalizations as to Time Warner's competitive environment and market strength. Such theories are insufficient to allege that Time Warner exercises market power in the claimed product and geographical markets.

LEAVE TO MOVE TO AMEND IS GRANTED

This motion is directed at the Third Amended Consolidated Class Action Complaint. As discussed, this Court previously granted a motion to dismiss and granted plaintiffs leave to replead. At the time, the Court noted the plaintiffs' obligation to adequately allege geographic markets and account for fiber-optic competition. 2010 WL 882989, at *9. At oral argument on March 3, 2010, counsel to the defendant argued that the First Amended Consolidated Class Action Complaint failed to account for competitive variations in Time Warner's local markets. (Mar. 3, 2010 Tr. at 56.) At a conference on July 6, 2010, after plaintiffs filed their Second Amended Consolidated Class Action Complaint, defense counsel again raised the variations in Time Warner's local markets and the implications for alleging market power. (July 6, 2010 Tr. at 16-18.) Following that conference, I once again granted

---

[7] Bodet v. Charter Communications, Inc., 2010 WL 5094214, at *6 (E.D. La. July 26, 2010), evaluated market power using a similar framework, but reached the opposite conclusion. Bodet, as here, weighed allegations of market power against the plaintiff's successfully pleaded geographic and product markets. Id. It concluded that "the plaintiff must show that Charter has sufficient market power in every area in which it operates to coerce consumers for premium cable into renting set-top boxes as a condition for receiving the full premium cable product," and that, "[a]lthough the plaintiff may have some hurdles to cross" in ultimately proving market power, its allegations as to market power were sufficient. Id. Bodet relied on the assertion that "relatively few consumers have a second wireline alternative" to a cable MVPD provider. Id. Here, as noted, the Complaint alleges Overbuilder presence in 22 of 53 local markets but, as also noted, its market power allegations do not recognize potential competitive differences between them.

plaintiffs leave to replead, and file the Complaint that is now subject to this motion. (Id. at 27-

29.)  At that time, the Court noted:

> . . . I will take into account of the fact of where we are, in essence
> round three now, at least round three, in deciding whether or not to
> grant leave to replead in the event I grant the defendant's motion to
> dismiss.  You have heard the defendant's arguments addressed to
> your new pleading, the second amended consolidated class action
> complaint.  And you're now being given leave to have another go
> at it.   .  .  .   [T]he likelihood that I would grant yet a further
> opportunity to replead would be substantially reduced.  I would
> exercise discretion.  I'm not throwing a steering wheel out the
> window.  But it would be a factor militating against granting leave
> to replead.

(Id. at 27-28.)  Considering that the 2010 Opinion raised plaintiffs' obligations to allege a

plausible geographic market, and that the defendant previously argued the plaintiffs' failure to

reconcile market power allegations with its market definitions, the issues are hardly new or

novel.

At the conclusion of their opposition memorandum, the plaintiffs request that, in

the event that the court grants the motion to dismiss, the plaintiffs be granted leave to replead.

Plaintiffs say nothing further about why such leave should be granted or what additional facts

might be alleged in a fourth amended complaint.  Rule 15(a)(2), Fed. R. Civ. P., provides that

"[t]he court should freely give leave [to amend] when justice so requires."  The standard,

although liberal, allows motions for leave to amend to be denied where the court finds "undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party . . . futility of

amendment, etc."  See Foman v. Davis, 371 U.S. 178, 182 (1962).

Lurking in or around the Third Amended Complaint is the potential to allege a

plausible theory of market power in Premium Cable Services as to some, but perhaps not all,

submarkets that comprise the alleged geographic market.  For example, the Complaint alleges

that in as many as 31 local markets, out of a total of 53, there was no competition from

Overbuilders.  (Compl. ¶¶ 86-88.)  Depending on whether there was significant competition from

another MVPD offering Premium Cable Services in a local market, and whether plaintiff can

allege an actual adverse effect, it may be that the plaintiffs could plausibly allege market power

in some or all of these local markets.

   The Court is hesitant to subject the defendant to the burden of repeatedly

responding to defective pleadings, but it is also hesitant to foreclose, due to overbroad allegations

brought by class counsel, the potentially viable claims of consumers in local markets where the

defendant possesses market power.  On balance, the interests of justice dictate that the plaintiffs

be permitted to file a motion to amend in which they annex a proposed Fourth Amended

Complaint that attempts to plausibly allege all elements of a tying claim, including standing,

coercion and market power in the relevant geographic markets.  Any motion to amend shall be

filed no later than May 13, 2011; defendant may respond by June 13, 2011; and plaintiffs may

reply by June 27, 2011.  If no such motion is filed by May 13, 2011, the Clerk will enter

judgment for the defendant.


CONCLUSION

   The defendant's motion to dismiss is GRANTED.

   SO ORDERED.

          P. Kevin Castel
         United States District Judge

Dated:  New York, New York
   April 8, 2011